PEOPLE v HENDERSON
PEOPLE v MERCIER

Docket Nos. 285677, 285678, and 285773. Submitted January 13, 2009, at
Detroit. Decided February 3, 2009, at 9:15 a.m. Leave to appeal
sought.

The Jackson Circuit Court, Chad C. Schumucker, J., reversed orders of
the 12th District Court that bound over on three felony charges of
animal torture James E. Henderson, Jr., the owner of three horses
allegedly tortured, and Matthew P. Mercier, the primary caretaker of
the horses. The circuit court did not reverse the parts of the orders
that bound the defendants over on one misdemeanor charge of failing
to provide adequate care for the horses, but did reverse the order of
the district court for the forfeiture of 69 horses owned by Henderson.
The prosecution appealed by leave granted the orders reversing the
district court's orders. The appeals were consolidated.

The Court of Appeals held:

1. The prosecution was not required to show that the defen-
dants intended to harm the animals. The prosecution was only
required to show probable cause to believe that the defendants
acted with conscious disregard of known risks in order to show
that the defendants willfully, maliciously, and without just cause or
excuse tortured three horses in violation of MCL 750.50b(2).

2. The prosecution, for a conviction under MCL 750.50b(2),
needed to establish probable cause to believe that the defendants
willfully (did something that resulted in torture to the animals),
maliciously (knowing it to be wrong, acted either intentionally or
with conscious disregard of the known risks), and without just
cause or excuse tortured the three horses. The evidence estab-
lished that the defendants willfully failed to seek necessary veteri-
nary care and treatment in conscious disregard of the known risk
that the horses would continue to decline in health and without
just cause or excuse, thereby causing the horses to suffer torture.

3. The defendants' alleged lack of intent to violate MCL
750.50b(2) or cause the three horses to suffer torture is of no
consequence. The district court properly bound both defendants
over on all three felony counts. The circuit court order reversing
the district court's bindover order regarding the felony counts
must be reversed and the case must be remanded.

4. The term "torture," when applied to animals, includes every act or omission that causes or permits an animal to suffer unjustifiable or unreasonable pain, suffering, or death. Under this definition or the definition that the district court applied (severe physical or mental pain, and agony or anguish), the evidence supports a finding that the three horses suffered torture under MCL 750.50b(2). The definition relied on by the district court does not warrant appellate relief. The three felony counts against both defendants must be reinstated.

5. The circuit court erred by reversing the order of forfeiture under MCL 750.50(3). An owner, possessor, or person having charge or custody of an animal may violate MCL 750.50(2)(a) by failing to provide adequate care for the animal. The evidence supports the district court's determination that Henderson failed to provide adequate care for horses that he owned. The circuit court's order reversing the district court's forfeiture order must be reversed and the case must be remanded.

Reversed and remanded.

1. CRIMINAL LAW — ANIMALS — ANIMAL TORTURE.

The prosecution, in order to support a conviction of animal torture, is not required to show that a defendant intended to harm an animal; the prosecution is only required to show that the defendant acted with conscious disregard of the known risks in order to establish that the defendant willfully, maliciously, and without just cause or excuse tortured an animal in violation of MCL 750.50b(2).

2. CRIMINAL LAW — ANIMALS — ANIMAL TORTURE — WORDS AND PHRASES — TORTURE.

The term "torture," as used in the statute prohibiting the torture of animals, includes every act or omission that causes or permits an animal to suffer unjustifiable or unreasonable pain, suffering, or death (MCL 750.50b[2]).

3. CRIMINAL LAW — ANIMALS — CARE OF ANIMALS.

A person may be found to have failed to provide an animal with adequate care in violation of MCL 750.50(2)(a) as owner of the animal, as possessor of the animal, or as a person having charge or custody of the animal.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Henry C. Zavislak*, Prosecuting Attorney, and *Jerrold Schrotenboer*, Chief Appellate Attorney, for the people.

*Dungan, Kirkpatrick & Dungan, P.L.L.C.* (by *Michael Dungan*), and *Richard B. Ginsberg* for James E. Henderson, Jr.

State Appellate Defender (by *Susan M. Meinberg*) for Matthew P. Mercier.

Amici Curiae:

*Mary Chartier* and *Rose Stern* for the Animal Law Section of the State Bar of Michigan.

*Alice Anna Phillips* for the American Humane Association.

*Robert K. Gaecke, Jr.,* for Leelanau Horse Rescue, Inc., and Laura Steenrod.

Before: CAVANAGH, P.J., and JANSEN and METER, JJ.

CAVANAGH, P.J. The prosecution appeals by leave granted the circuit court's reversal of the district court's order binding over defendants on three felony counts of animal torture, MCL 750.50b(2). We reverse and reinstate the charges against both defendants. The prosecution also appeals by leave granted the circuit court's reversal of the district court's forfeiture order that was entered pursuant to MCL 750.50(3). We reverse that order as well.

Between January 1, 2007, and March 20, 2007, defendant James Edward Henderson, Jr., owned most, if not all, of the 69 horses that were on the Turn Three Ranch located in Grass Lake Township. Defendant Matthew Patrick Mercier was the primary caretaker of the horses, while Henderson primarily paid the bills associated with the horses and the horse farm. On March 13, 2007, when some of the horses were found

outside the farm, as had happened several times in the past, Jackson County Animal Control was contacted. After animal control conducted a limited inspection of the farm, a detailed investigation followed. Thereafter, the farm was seized. Three felony charges of animal torture, MCL 750.50b(2), and one misdemeanor charge of failing to provide adequate care to the horses, MCL 750.50(2)(a), were filed against both defendants. A civil forfeiture action was also filed against Henderson.

Extensive testimony regarding the general condition of the land, barn, buildings, fences, horse shelters, hay, water tanks, and the horses was presented at the preliminary examination. Three horses were the subject of the felony charges: Ice, also known as Wire; Moose (a grulla mare); and Lucky Seven, also known as Elvis. Ice had a severely infected leg wound caused by having wire embedded in her leg for three weeks or more. Moose was severely emaciated and heavily infested with parasites. Lucky Seven was severely emaciated, had severe lice, was rendered significantly lame by an extremely painful degenerative arthritic condition, and was ultimately euthanized. The testimony also included that many, if not all, of the horses at the farm had lice, worms, parasites, hair loss, and long hooves. Many were significantly underweight. There was also testimony that there was inadequate food, water, shelter, and veterinary care, as well as unsanitary conditions. At the conclusion of the seven-day preliminary examination, defendants were bound over on all the charges and the district court entered an order of forfeiture pursuant to MCL 750.50(3).

The forfeiture order was subsequently appealed to the circuit court. The circuit court reversed the order, holding that the evidence did not establish that Henderson had charge or custody of the animals. In fact, the

court held, Henderson was an innocent owner under the circumstances. Defendants also filed a motion to quash the information in the circuit court. The circuit court granted defendants' motion with regard to the three felony counts, but denied the motion with respect to the misdemeanor counts. The court held that the district court's findings suggested negligence, as opposed to an intent to cause harm. Citing *People v Fennell*, 260 Mich App 261; 677 NW2d 66 (2004), the court noted "[t]he elements from *Fennell* require that the Defendant knew that his actions were wrong at the time he intended to commit the crime and intended to cause physical or mental harm to an animal." The court also concluded that Henderson's mere ownership of the horses or farm did not make him responsible for animal torture and that his presence on the farm was not sufficient to establish that he was aware of the horses' condition.

After the proper orders were entered, the prosecution sought leave to file interlocutory appeals regarding the order granting defendants' motion to quash the felony counts and the order reversing the forfeiture order. We granted these applications for leave to appeal and consolidated the appeals. We also granted motions to file amicus curiae briefs on behalf of (1) the Animal Law Section of the State Bar of Michigan, (2) the American Humane Association, and (3) Leelanau Horse Rescue, Inc., and Laura Steenrod.

## FELONY COUNTS, DOCKET NOS. 285677 AND 285678

First, the prosecution argues that, in light of the evidence, the district court did not abuse its discretion by finding probable cause to believe that defendants "willfully, maliciously and without just cause or excuse" tortured three horses in violation of MCL 750.50b(2).

Specifically, the prosecution argues that the circuit court misread *Fennell, supra,* and ignored *People v Iehl,* 100 Mich App 277, 280; 299 NW2d 46 (1980), which require only a showing of probable cause that defendants acted with conscious disregard of the known risks, and not that they acted with an intent to cause harm. We agree.

The primary function of the preliminary examination is to determine whether a crime has been committed and, if so, whether there is probable cause to believe that the defendant committed it. *People v Glass (After Remand),* 464 Mich 266, 277; 627 NW2d 261 (2001). Probable cause that the defendant has committed a crime is established by evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt. *People v Yost,* 468 Mich 122, 126; 659 NW2d 604 (2003). To establish that a crime has been committed, a prosecutor need not prove each element beyond a reasonable doubt, but must present some evidence of each element. *Id.* Circumstantial evidence and reasonable inferences from the evidence can be sufficient. *People v Greene,* 255 Mich App 426, 444; 661 NW2d 616 (2003). If the evidence conflicts or raises a reasonable doubt, the defendant should be bound over for trial, where the questions can be resolved by the trier of fact. *Yost, supra* at 128.

A district court's ruling that alleged conduct falls within the scope of a criminal law is a question of law that is reviewed de novo for error, but a decision to bind over a defendant based on the factual sufficiency of the evidence is reviewed for an abuse of discretion. *People v Perkins,* 468 Mich 448, 452; 662 NW2d 727 (2003); *People v Hotrum,* 244 Mich App 189, 191; 624 NW2d 469 (2000). In reviewing the bindover decision, a circuit court must consider the entire record of the preliminary

examination and may not substitute its judgment for that of the district court. *People v McKinley*, 255 Mich App 20, 25; 661 NW2d 599 (2003). The decision to bind over a defendant may only be reversed if it appears on the record that the district court abused its discretion. *Id.* This Court also reviews the bindover decision de novo to determine whether the district court abused its discretion. *People v Libbett*, 251 Mich App 353, 357; 650 NW2d 407 (2002). Thus, this Court gives no deference to the circuit court's decision. *People v Harlan*, 258 Mich App 137, 145; 669 NW2d 872 (2003).

MCL 750.50b(2) provides that "[a] person who willfully, maliciously and without just cause or excuse kills, tortures, mutilates, maims, or disfigures an animal . . . is guilty of a felony . . . ."

Here, defendants were charged under the torture provision of MCL 750.50b(2). Thus, defendants were charged with three counts of willfully, maliciously, and without just cause or excuse torturing three horses, i.e., Ice, Moose, and Lucky Seven. The statutory requirements were examined in *Fennell*, *supra*. All the parties rely on *Fennell*, but offer different interpretations of its holding and the "intent" required under the statute. The prosecution argues that in order to show that defendants willfully and maliciously tortured an animal, it is sufficient to show that defendants acted with conscious disregard of the known risks. Defendants argue that the prosecution must prove that defendants intended to harm the animals.

In *Fennell*, the defendant threw a firecracker into a horse stable, causing the stable to burn to the ground and killing 19 horses. *Fennell*, *supra* at 263-264. The defendant was convicted of 19 counts of willfully and maliciously torturing or killing animals, MCL 750.50b(2). *Fennell*, *supra* at 262. At issue in that case was the degree

of intent required under the animal torture statute. *Id*. The trial court instructed the jury that to convict the defendant, it must find that he "(1) killed or tortured an animal or did anything that resulted in such an outcome; (2) knew that his actions were wrong at the time he committed this crime; (3) intended to cause physical or mental harm to an animal; and (4) had no just cause or excuse for his actions." *Id*. at 269.

The defendant in *Fennell* argued on appeal that the trial court erred by refusing to instruct the jury that the prosecution was required to show that he specifically intended to kill or torture the horses. *Id*. at 264. This Court interpreted the "willfully" and "maliciously" requirements of the statute and considered whether they connoted a specific intent crime. On the "willfulness" element, the defendant argued that the Legislature's use of the term "willfully" meant that the crime required a criminal intent beyond merely an intent to do the act. *Id*. at 266. This Court disagreed, first explaining that "[a] crime requiring a particular criminal intent beyond the act done is generally considered a specific intent crime; whereas, a general intent crime merely requires 'the intent to perform the physical act itself.' " *Id*. (citations omitted).

Then, because the statute does not define "willfully," the *Fennell* Court examined several sources for guidance, including its dictionary definition that described an action that is " '[v]oluntary and intentional, but not necessarily malicious.' " *Id*. at 267, quoting Black's Law Dictionary (7th ed). The *Fennell* Court also considered the statute's language in light of its predecessor statute and subsequent developments. *Fennell, supra* at 268. Specifically, MCL 750.377[1] made it a crime for any person to " 'willfully and maliciously kill, maim, or

---

[1] MCL 750.377 was repealed by 1994 PA 126, effective March 30, 1995.

disfigure any horses, cattle, or other beasts of another[.]' " *Fennell, supra* at 268. The similarity to the language of MCL 750.50b(2) was deemed significant:

> This language is almost identical to that used in MCL 750.50b(2). This is noteworthy because several cases discussing MCL 750.377 have held that it only required a showing of general malice. In determining that malice need not be directed toward the animal or the animal owner, the Court in *People v Tessmer* noted that the requisite malice required was the general malice of the law of crime. Further, in *Culp*, this Court specifically distinguished the statutory crime of willfully and maliciously killing an animal from the specific intent crime of malicious destruction of property. [*Fennell, supra* at 268, citing *People v Tessmer*, 171 Mich 522, 526-527; 137 NW 214 (1912), and *People v Culp*, 108 Mich App 452, 457-458; 310 NW2d 421 (1981).]

The Court concluded that the portion of MCL 750.50b(2) relating to killing or torturing an animal is a general intent crime. *Fennell, supra* at 263, 269.[2] Accordingly, the jury was not required to find that the defendant intended to kill or torture the animals in order to find that he acted willfully, i.e., the jury was properly instructed that the defendant could be convicted of this crime if he " 'killed and/or tortured an animal or did anything that resulted in the killing or torturing of an animal.' " *Id.* at 269.

Then the *Fennell* Court turned to the malice element of MCL 750.50b(2) and adopted a definition of malice from *Iehl, supra*, an animal torture case under the predecessor statute, MCL 750.377. The *Fennell* Court held:

---

[2] As the American Humane Association's amicus curiae brief explains in great detail, this conclusion that the statute is a general intent crime is consistent with animal cruelty laws across the nation.

> Malice has been described an [sic] essential element in a conviction for animal cruelty. . . . [I]n *People v Iehl*, this Court held that the element of malice under MCL 750.377, "requires only that the jury find that defendant 1) committed the act, 2) while knowing it to be wrong, 3) without just cause or excuse, and 4) **did it intentionally** *or* 5) **with a conscious disregard of known risks** to the property of another." Considered as a whole, we find that the trial court's instructions properly conveyed the element of malice to the jury. [*Fennell, supra* at 269-270, citing *Iehl, supra* at 280 (emphasis added).]

In this case, defendants argue that an intent to harm the animal is required on the basis of the *Fennell* Court's holding that the jury instructions given in *that* case, which did not include the "conscious disregard of known risks" language, were deemed sufficient. But, as the amicus curiae brief of the Animal Law Section of the State Bar of Michigan aptly points out, the facts in the *Fennell* case were that the defendant intentionally threw a firecracker into a barn full of horses. *Fennell, supra*, at 263-264. The "conscious disregard" instruction was not warranted by the facts of that case. Nevertheless, the *Fennell* Court clearly recognized that malice can be established by showing that the defendant acted either intentionally or with conscious disregard of known risks. Obviously, if the statute requires a showing that the defendant acted with *either* an intent to harm *or* a conscious disregard of known risks, and the *Fennell* jury convicted the defendant on the basis of an instruction that included only an intent to harm, then no instructional error occurred. Therefore, defendants' and the circuit court's interpretation of *Fennell* is incorrect. The prosecution need not prove that defendants intended to harm the animals.

Next, we consider whether the district court abused its discretion by finding probable cause to bind defen-

dants over on the felony counts. The testimony in this case was extensive. There was a plethora of evidence regarding (1) the poor, unsanitary, or hazardous conditions of the land, barn, horse stalls, buildings, fences, and horse shelters, (2) the lack of quality hay or food for the horses for a lengthy period, and (3) the lack of quality water for the horses, including evidence that the horses were likely drinking from a county drainage ditch that was contaminated with *E. coli*. Defendant Mercier, who was the primary caretaker of the horses, lived with a friend about 45 minutes of driving time from the farm during the relevant period. There was also abundant evidence regarding the condition of the horses. Several veterinarians and animal control officers with extensive experience with horses testified that at least 11 horses were considered severely emaciated, most of the others were considered very thin, and only some were found to be in fair condition. The horses had long hooves and were heavily infested with parasites, both externally with lice, causing hair loss, and internally with worms.

The felony charges against defendants pertain to three horses. First, we consider Ice. The evidence showed that wire, likely from the extensive debris strewn about the farm, had been wrapped completely around her leg and had formed a knot. The wire was embedded in her leg for at least three weeks and had cut through to the bone. The wire was protruding about $1^1/2$ inches from the open wound and the wound was obviously severely infected. Ice also was emaciated and had a large lump on the back of her right leg, a very large hernia, and a cut on her forehead. Defendants did not have Ice treated by a veterinarian. Dr. Richard Hammer, a veterinarian for 19 years who practiced primarily equine medicine, testified that "[i]t is very unusual to deal with a wound that's that neglected." The evidence also showed that defendants had extensive experience with horses and were aware of the

wire injury to Ice. And Dr. James Irving, a veterinarian, testified that Mercier contacted him about Ice on March 16 seeking to bring Ice in for treatment, two days after animal control became involved in this matter.

Second, we consider Moose, a four- to five-year-old grulla mare. The evidence indicated that Moose was severely emaciated and heavily infested with parasites. An animal control officer described her as a walking skeleton. Dr. Hammer testified that Moose was severely emaciated to the point that you could see all the bones in her body and no fat whatsoever. She should have weighed 1,100 pounds but weighed 685 pounds. Dr. Hammer also testified that Moose had no medical problems that would have caused her to be in that condition. In fact, he testified that about 30 days after he first saw her, Moose had shown marked improvement with only a parasite control program and feeding initiated by animal control. Mercier admitted to an animal control officer that he "dropped the ball" with regard to Moose, which, in December 2006, "had lost a little weight," supposedly from gas colic. Although there was no evidence of any medical condition, defendants' veterinarian, Dr. Robert Sray, testified that Moose was "probably thin" because of "sickness." According to Dr. Sray, none of the horses, including this 685-pound horse, looked starved.

Third, we consider Lucky Seven, a paint. The evidence included that he was severely emaciated, heavily infested with parasites, and significantly lame because of an extremely painful degenerative arthritic condition. He ultimately had to be euthanized. When animal control became involved in this matter, an officer noticed that Lucky Seven could not bear weight on one leg and was dragging it. Dr. Hammer testified that Lucky

Seven was severely emaciated, severely lame on the right rear leg, had an enlarged stifle joint, and was very tender in the hips. Dr. Hammer also testified that the pathology report indicated a severely starved, chronic condition, with basically bone-to-bone contact in the hip, stifle, and hock joints, which would be extremely painful. The pathology report also showed heavy damage to Lucky Seven's intestinal tract because of parasites and that it would have affected his body's ability to absorb nutrients. Dr. Judith Marteniuk, a veterinarian for 32 years, testified that she treated Lucky Seven at the Michigan State University veterinary large animal clinic and that he was about a year old. He had one of the worst cases of lice she had ever seen, and she took pictures of it for teaching purposes. Dr. Marteniuk testified that Lucky Seven had severe degenerative arthritis of the right hip and that it was a longstanding condition—probably months—and would have been extremely painful. Nevertheless, defendants' veterinarian, Dr. Sray, testified that, although he saw that Lucky Seven was "sore in the hip," he was not very concerned about him. And Dr. Kurt Williams, who performed the necropsy on Lucky Seven, testified that Lucky Seven would have been severely lame from his condition.

When this extensive evidence is considered as a whole, it is clear that the prosecution established that a crime was committed and that probable cause exists to believe that defendants committed it. See *Glass (After Remand)*, *supra*. To establish that a crime has been committed, the prosecution only had to present some evidence of each element. *Yost*, *supra*. Circumstantial evidence and reasonable inferences from the evidence can be sufficient. *Greene*, *supra*. Under the portion of MCL 750.50b(2) at issue here, the prosecution needed to establish probable cause to believe that defendants willfully (i.e., did something that resulted in torture to

the animal), maliciously (i.e., knowing it to be wrong, acted either intentionally *or* with conscious disregard of known risks), and without just cause or excuse tortured the three horses. See *Fennell, supra* at 268-270.

Here, at a minimum and as charged in the information, the evidence established probable cause to believe that defendants willfully failed to seek necessary veterinary care and treatment for these three horses, despite defendants' extensive experience with horses, the long-standing and obvious nature of the horses' problems, and defendants' knowledge that the horses were not healthy, in conscious disregard of the known risk that they would continue to decline in health to the point of having to be euthanized and that without just cause or excuse, defendants caused them to suffer "torture," which the district court defined as "severe physical or mental pain, agony or anguish." Dr. Hammer testified that these three horses were "tortured," i.e., suffered severe physical or mental pain, agony, or anguish. And Dr. Marteniuk testified that Lucky Seven suffered torture, i.e., agony of body or mind, as a result of his condition. The testimony was consistent—the abhorrent conditions at the farm, as well as the unhealthy conditions of the horses, existed for several months.

Defendant Henderson argues on appeal that because he had no responsibility for the day-to-day care of the horses, the felony charges against him were not supported by probable cause. We disagree. Henderson relies on the case of *People v Johnson,* 104 Mich App 629; 305 NW2d 560 (1981), in support of his "innocent or absentee owner" defense. The circuit court did as well. However, Henderson fails to note in his argument that the statute under which the *Johnson* Court held that "an innocent or absentee owner cannot be held criminally liable for mistreatment of a horse that he owns

but that is cared for by someone else" is clearly distinguishable from MCL 750.50b(2), the statute at issue in this case. And the statute in the *Johnson* case, MCL 752.21, has been repealed. Suffice it to say that we are not persuaded by this argument. And although we are not persuaded that an "innocent or absentee owner" defense exists, if it did exist, it would not be applicable under the facts of this case.

Throughout his arguments, Henderson refers us to, and relies on, his and Mercier's preliminary examination testimony in support of his argument that dismissal of the felony charges against him was proper. But, as was noted during closing arguments and by the district court, MCL 750.50(3) provides that the testimony of a person at a forfeiture proceeding is generally not admissible against him in a criminal proceeding and does not waive the person's constitutional right against self-incrimination. Because the preliminary examination and the forfeiture proceeding were combined in this case, we have not considered either defendant's testimony with regard to our resolution of this criminal matter.

The record evidence showed that Henderson had a significant investment in this farm and the 69 horses, most of which he owned. He leased the property on which the farm was situated and paid the bills associated with the farm and the horses. The property, barn, buildings, shelters, and fences had been in a severe state of disrepair—to the point of being hazardous—for a long time. Although the amount of hay that would be required to feed 69 horses daily is significant—typically 25 to 30 pounds of hay for each horse according to Dr. Vicki Chickering, a field veterinarian on the staff of the Department of Agriculture who had been a veterinarian for 31 years—there was no stockpile of hay in the barn.

Thus, Henderson would have had to purchase hay regularly. According to Perry Haag, defendants' witness, a round bale of hay, weighing between 1,000 and 1,500 pounds, costs $30 to $40. There was no evidence of regular hay purchases except for the testimony of Haag and Arthur Feldkamp, both of whom claimed to have sold hay on occasion to Mercier. The thin and emaciated, as well as severely parasitic, condition of the horses were several months in duration. And there was testimony from three witnesses to the effect that Henderson was seen at the farm in December 2006, as well as multiple times in January, February, and March 2007. One witness testified that he had seen Henderson drive up Maute Road, in the direction where the farm was located, two to three times a week from January through March 2007.

In summary, there was significant evidence of Henderson's involvement in this farm, as well as the long-standing nature of the poor condition of both the farm and the horses. He was the primary source of funding for the farm and for the care, including veterinary care, of the horses. Caring for and feeding the horses was costly. He was seen at the farm during the relevant months. Circumstantial evidence and reasonable inferences from the evidence establish probable cause to believe that Henderson willfully failed to seek necessary veterinary care and treatment for these three horses, despite his extensive experience with horses, the long-standing and obvious nature of the horses' problems, and his knowledge that the horses were in unhealthy conditions, in conscious disregard of the known risk that they would continue to decline in health to the point of having to be euthanized and that without just cause or excuse, he caused them to suffer "torture," which the district court defined as "severe physical or mental pain, agony or anguish." See *Fennell, supra* at

270-271 ("Minimal circumstantial evidence is sufficient to prove an actor's state of mind."); see, also, *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). Were we to consider defendants' preliminary examination testimony, as both defendants urge, we would find that our conclusions are bolstered by that testimony. Further, any conflicts in the evidence must be resolved by the trier of fact. *Yost, supra* at 128.

Accordingly, the district court properly bound both defendants over on all three felony counts. See *Libbett, supra*. That defendants did not intend to violate MCL 750.50b(2) or that they did not intend to cause these three horses to suffer torture is of no consequence. Thus, the circuit court's reversal of the bindover decisions, which was premised on an erroneous interpretation of MCL 750.50b(2), is reversed.

Because additional proceedings will follow for the felony counts, we find it necessary to address defendants' repeated claims in their briefs on appeal that the district court's definition of "torture" was erroneous, even though they had not previously challenged this definition. The *Fennell* Court did not define the statutory term "torture." Referenced in the *Fennell* opinion is the jury instruction given by the trial court to the *Fennell* jury, which defined "torture" as " 'severe physical or mental pain, and agony or anguish.' " *Fennell, supra* at 266. It is unclear how this definition was derived, but it was not an issue on appeal. The district court in this case adopted that definition for purposes of this preliminary examination.

The statutory term "torture" is not defined in our animal cruelty statutes. We are mindful of the directives that statutory language should be construed reasonably and that the fair and natural import of the terms employed, in view of the subject matter of the law, governs.

*People v Green*, 260 Mich App 710, 715; 680 NW2d 477 (2004); *People v Spann*, 250 Mich App 527, 530; 655 NW2d 251 (2002). Turning to the dictionary in this instance is of little assistance. Meanings similar to the jury instruction definition discussed above can be found. Considering the subject matter at issue—animals—a determination of "severe physical or mental pain, and agony or anguish" may be confusing or arduous.

Turning to the law of our sister states for guidance, we find that many have provisions specifically defining "torture" as the term relates to their animal offense statutes. See *Glass v Goeckel*, 473 Mich 667, 674 n 4; 703 NW2d 58 (2005). After considered review, we note that the term "torture" is commonly defined to include every act or omission that causes or permits an animal to suffer unjustifiable or unreasonable pain, suffering, or death. See, e.g., *People v Sitors*, 12 Misc 3d 928, 931; 815 NYS2d 393 (2006), citing NY Agriculture and Markets Law 350(2); *People v Thomason*, 84 Cal App 4th 1064, 1067; 101 Cal Rptr 2d 247 (2000), citing Cal Penal Code 599b; *State v Howell*, 137 Ohio App 3d 804, 817; 739 NE2d 1219 (2000), citing Ohio Rev Code Ann 1717.01(B); *In re William G*, 52 Md App 131, 132; 447 A2d 493 (1982), citing Md Code Ann art 27, § 62 (1982); see, also, SD Codified Laws 40-1-2.2; Tenn Code Ann 39-14-201(4). We are persuaded that this definition is an appropriate and reasonable construction of the term "torture," as it uniquely pertains to animals, and accomplishes the statute's purpose; namely, to ensure that animals are treated humanely. See MCL 750.49 *et seq.*; *People v Adair*, 452 Mich 473, 479-480; 550 NW2d 505 (1996).

In this case, whether "torture" was defined for purposes of the preliminary examination as "severe physical or mental pain, and agony or anguish" or as

"every act or omission that causes or permits an animal to suffer unjustifiable or unreasonable pain, suffering, or death," the evidence supported a finding that these three horses suffered torture under MCL 750.50b(2). Thus, the definition of "torture" relied on by the district court does not warrant appellate relief. Accordingly, the three felony counts against both defendants are reinstated for further proceedings consistent with this opinion.

### FORFEITURE ACTION, DOCKET NO. 285773

Next, the prosecution argues that the circuit court erred by reversing the district court's order of forfeiture of 69 horses under MCL 750.50(3). We agree. This Court reviews questions of statutory interpretation de novo. *People v Herrick*, 277 Mich App 255, 256-257; 744 NW2d 370 (2007).

MCL 750.50(3) establishes a procedure by which forfeiture of animals may occur before the disposition of criminal charges of animal cruelty or animal torture under MCL 750.50(2) or MCL 750.50b(2). In a civil forfeiture action, the prosecution must prove its case by a preponderance of the evidence. MCL 750.50(3). The misdemeanor charge that underlies the instant forfeiture action was an alleged violation of MCL 750.50(2)(a), which provides:

> An owner, possessor, or person having the charge or custody of an animal shall not do any of the following:
>
> (a) Fail to provide an animal with adequate care.

Adequate care is "the provision of sufficient food, water, shelter, sanitary conditions, exercise, and veterinary medical attention in order to maintain an animal in a state of good health." MCL 750.50(1)(a). " 'Sanitary conditions' means space free from health hazards in-

cluding excessive animal waste, overcrowding of animals, or other conditions that endanger the animal's health." MCL 750.50(1)(i).

The district court held that, on the basis of all the evidence previously discussed, the prosecution established the misdemeanor count of inadequate care by a preponderance of the evidence to support the forfeiture of the horses. The court stated that "there was not sufficient provision, sufficient food, water, shelter, sanitary conditions, exercise, veterinary medical condition [sic] in order to maintain the animals in a state of good health." The district court rejected defendant Henderson's claim that he was an innocent owner on the ground that the evidence placed him on the farm. The circuit court disagreed, holding that there was insufficient evidence of Henderson's presence on the farm. Specifically, the court held: "It's clear that Mr. Mercier was the caretaker and the one in charge of the horses and therefore I do find that Mr. Henderson not [sic] have charge or custody of the animals and is in fact an innocent owner in these circumstances based on the record even taking everything in the light most favorable to the prosecution."

The dispute here is the proper interpretation of MCL 750.50(2). The statute prohibits "[a]n owner, possessor, or person having the charge or custody of an animal" from failing to provide adequate care. The prosecution argues that as the owner of the horses, Henderson is liable for failure to provide adequate care, regardless of whether the horses were in his charge or custody. The prosecution urges an interpretation of the statute that identifies three separate statuses, i.e., (1) owner, (2) possessor, or (3) person having charge or custody. Under this construction, the phrase "having charge or custody" pertains only to "person," distinct from an owner or possessor of the animal.

In contrast, Henderson argues that, although he owned the horses, he did not have charge or custody of them. He maintains that ownership alone is insufficient for liability. The horses were in Mercier's care and custody, and Mercier was the person responsible for them in Henderson's absence. In essence, Henderson reads the statutory phrase "having the charge or custody" as describing all three preceding statuses, i.e., owner, possessor, or other person, so that he must be an owner having charge or custody of the horses in order to be liable for failure to provide adequate care.

In support of his position, Henderson again relies on *Johnson, supra,* a case in which this Court construed an earlier version of the animal cruelty statute, MCL 752.21, repealed by 1994 PA 126, which prohibited cruelty to an animal by a person "having the charge or custody of any animal, either as owner or otherwise[.]" In that case, this Court reversed a defendant's conviction that was solely based on his co-ownership of a mistreated horse, because the other owners had assumed responsibility for the horse's care. *Johnson, supra* at 633-634. The prosecution was required to present evidence that the horse was in that defendant's charge or custody. *Id.* at 632-633. This Court explained that the statutory phrase " 'as owner or otherwise' refers to the fact that a person having charge or custody of an abused animal may be held liable without regard to ownership." *Id.* at 633. However, the Legislature repealed MCL 752.21 in 1994. The statutory language construed in *Johnson,* which applied to a person "having the charge or custody of any animal, either as owner or otherwise," made ownership irrelevant to the "having the charge or custody" requirement. The present animal cruelty statute, MCL 750.50(2), is worded differently; it applies to "[a]n owner, possessor, or person having the charge or custody of an animal . . . ."

The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). Statutory language should be construed reasonably, keeping in mind the purpose of the act. *Spann, supra.* We are also guided by several rules of construction. Relevant to this case is the tenet that, when a statute is repealed and another statute is enacted that covers the same subject area, a change in wording is presumed to reflect a legislative intent to change the statute's meaning. *Williams v Auto Club Group Ins Co (On Remand)*, 224 Mich App 313, 319; 569 NW2d 403 (1997). In this case, the change in the statutory language appears to be an effort to make owners of an animal legally responsible for their failure to provide adequate care to the animal. The repealed statute made the fact of ownership irrelevant. Under the present statute, the owner of an animal cannot just give that animal to someone to care for it without the attendant responsibility to ensure that the animal receives adequate care. If a person does not want to be bothered with the detail of ensuring that his animal receives adequate care, he should not own the animal.

Another rule of statutory construction relevant here is the rule of the last antecedent, as the amicus curiae brief of Leelanau Horse Rescue and Laura Steenrod sets forth. Generally, a modifying clause will be construed to modify only the last antecedent, unless something in the subject matter or dominant purpose requires a different interpretation. *Dessart v Burak*, 470 Mich 37, 41; 678 NW2d 615 (2004). Here, the last antecedent to the modifying clause "having the charge or custody of an animal" is "person." There is nothing in the subject matter or grammatical construction that leads us to conclude that the rule does not apply here. If the modifying clause applied to, for example, "pos-

sessor," the resulting clause would be redundant because a "possessor" in this instance is a person who has possession of an animal. Further, the Legislature is presumed to have known the rules of grammar. *People v Beardsley*, 263 Mich App 408, 412-413; 688 NW2d 304 (2004). Thus, if the modifying clause was meant to be applied to an owner, possessor, or person, the clause would have been set off by a punctuation mark so that the provision would read "[a]n owner, possessor, or person, having the charge or custody of an animal, shall not . . . ." See, e.g., *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 71; 718 NW2d 784 (2006). There is no such punctuation. Accordingly, we conclude that MCL 750.50(2) prohibits an owner of an animal from failing to provide that animal with adequate care.

In this case, it is undisputed that Henderson was the owner of the horses that were the subject of the forfeiture order. Thus, we turn to whether he failed to provide those horses with adequate care. As discussed above, Henderson leased the property on which the horses were located and he was responsible for paying for their care. As discussed above, extensive evidence was presented at the hearing. The evidence included that there were poor, unsanitary, or hazardous conditions on the land, in the barn, in the horse stalls, and in the buildings. For example, debris including wire, nails, boards, steel siding, and hoses cluttered the pastures and fields on which the horses roamed. The barn also contained significant debris, and the horse stalls, most of which had inappropriate gates, were overcrowded and were filled with several inches of urine and manure to the extent that there were no dry spots for the horses to stand or lie. The fences were in disrepair and inadequate, allowing the horses to repeatedly leave the farm and cross major roads. Because of a lack of water, the horses were allowed, or forced, to drink water from

an *E. coli* contaminated county ditch that ran at the bottom of a steep hill. The horse shelters were abysmal. There was insufficient or poor quality hay.

Further, several veterinarians and animal control officers with extensive experience with horses testified that many of the horses were severely emaciated and only a few were in fair condition. The horses had long hooves—some of which were split—and all the horses were heavily infested with parasites, both externally with lice, causing hair loss, and internally with worms. Many were injured and did not receive veterinary care. Clearly, the prosecution established by a preponderance of the evidence that Henderson failed to provide every horse on this farm with adequate care during the relevant period. That Mercier was supposed to take care of the horses is of no consequence because he did not. Accordingly, the circuit court's order reversing the forfeiture of the 69 horses under MCL 750.50(3) is reversed.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.