*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

LEWIS JUNIOR SMITH,

        Defendant-Appellee.

UNPUBLISHED
October 19, 2023

No. 365252
Washtenaw Circuit Court
LC No. 21-000591-FC

Before: BOONSTRA, P.J., and BORRELLO and FEENEY, JJ.

PER CURIAM.

In this interlocutory appeal, the prosecutor appeals by leave granted[1] the trial court's denial of a motion to amend the information. For the reasons set forth in this opinion we reverse and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

The complainant in this matter testified at defendant's preliminary examination that on September 19, 2018, while in Ann Arbor, and after attending church, she met her boyfriend, Jim, for coffee at the Starbucks located on the corner of Liberty and State Streets. Upon leaving Starbucks, the couple separated and went their own ways, with the complainant walking to the "Blake Bus Station," and then proceeded to enter a party store "kiddy-corner to the bus station," where she purchased a pint of vodka and a bottle of flavored water. When she came out of the party store she recognized someone she knew from her alcohol abuse recovery program sitting in an SUV parked outside the party store. The male, whose name she did not remember, was with two other males, one of whom she identified as defendant. The complainant said "hi" to the male she recognized and mentioned that she was waiting for a bus to get home. She added that the three males then offered her a ride to her apartment, which was a 5- or 6-minute drive from the bus station. Because she trusted the male she knew from the recovery program---"I trusted that I was

---

[1] *People v Smith*, unpublished order of the Court of Appeals, entered May 12, 2023 (Docket No. 365252).

going to get a ride home---" she accepted the offer of the ride. She got into the front seat of the vehicle with the three males, intending on directing them to her house.

According to the complainant, the group made three or four stops over a couple of hours, including one at Liberty Plaza. These stops "confused" her because she had told the males that she wanted to go home. She inferred from these stops that she was not going to get home "immediately," but she did not know whether they were ever going to take her home. She did not try to get out of the SUV during this time because she "was still thinking I was going to get my ride home." Neither defendant nor the other two males in the vehicle told her during this time that she could not leave the SUV.

The complainant testified that when she got into the vehicle she was sober; however, at some point she began to drink "a little" of her vodka. She had no memory of drinking anything else or of whether she finished the pint of vodka. But at some point in time, "probably . . . heading into evening," according to the complainant, "something else was in the car." She did not recall what else had been provided to her other than that it was something to drink from a bottle. She believed that the other males were still in the vehicle at the time; she did not recall who gave her the bottle. The complainant testified that "over time, things got blurry for me," though she did not believe that she had drank enough to become "as intoxicated as I felt."

Eventually, only the complainant and defendant were left in the vehicle. They stopped at an apartment and got out of the vehicle. The complainant did not recall how she got from the vehicle to the apartment. It was evening by the time they arrived at the apartment and she remembered being in the apartment, that it was "very dark" and "very scary," and that "there were some things going on there that I was very uncomfortable with[,]" such as people smoking crack and "doing drugs."

The complainant testified that defendant eventually took her into a bedroom where he began to get physically intimate with her:

[a]nd I was very, very – I was just feeling very drugged, I didn't know what was going on. I just wanted to go home. And I said no, and that was not heard by him.

During this time, defendant was "taking clothes off" and "sex was happening," though the complainant told defendant "no" multiple times. The complainant testified she was "very in and out[]" by which she meant that "I felt like I was drugged." The complainant elaborated further: "I don't feel I had drank [sic] enough to feel the way I was feeling." She was also "just extremely uncomfortable, and I didn't know what was happening." She then passed out. The next thing the complainant recalled was being told by the person whose apartment they were in to leave. She also recalled that it was very early in the morning of the next day, perhaps 2 or 3 a.m. Although her memory was blurry, she remembered being taken to different places in Ypsilanti by defendant, but she had no memory of how she got out of the apartment.

According to the complainant, she remembered getting out of defendant's SUV at some point in time and getting into a van, where "this kid" was present. She thought they got into the van "to do some sort of drug exchange." The complainant also remembered there being "a drug deal of sorts." Once in the van, she "was just out of it again." The complainant testified that on

-2-

September 20, 2018, she passed out in the van from what she thought was a combination of liquor and drugs.

The complainant further testified that she remembered going into a white house with defendant. She thought that she, defendant, and the others from the van had walked to the house. She remembered being taken upstairs by defendant as well as feeling "blurry." The complainant once again testified that she slipped into unconsciousness while on a bed. When she came to, defendant was on top of her with his penis inside her vagina and his hands around her neck. When the complainant told defendant to stop and attempted to push defendant off, he became angry because she wanted the nonconsensual intercourse to end. Nevertheless, he did get off her "[w]hen I pushed him off." The next thing she recalled was defendant giving her a grocery bag containing clothes that were not hers and "kinda being thrown out of the house." She then ran out the front door and to a waiting friend's car. According to the complainant, friends were waiting outside because "they had located me" by using a tracking app. The complainant indicated that she "was hysterical" by the time she climbed into the friend's car. At her request, she was taken to the emergency room.

Emran Chowdhury testified that the complainant was his friend. They had met in an AA recovery program. According to Chowdhury, after talking with others, he began to look for the complainant because she had a tracking app known as Life 360 on her phone because "she had gone missing before." Chowdhury used this app to find the complainant. The app indicated that the complainant was in downtown Ann Arbor "in the middle of the night," i.e., 3 or 4 a.m. While circling the block, Chowdhury saw the complainant:

> in a – in a van with a gentleman driving. And as I approached the van [on foot], he kept pulling forward as I tried to look in the passenger seat. It was – it looked like it was [the complainant]. And then as soon as I asked, you know, I – I – I let the gentleman know I'm looking for somebody, have you seen a blonde woman. As soon as I said that, he jetted. And I tried to chase after him to get the license plate, but I could not get that.

The van was stopped at a stop sign, waiting to make a left turn, when Chowdhury approached the driver's side of the vehicle. Chowdhury identified defendant as the van's driver and testified that the complainant sat in the front seat of the van with her "legs up, and she had her head down." Chowdhury knew the woman in the passenger seat was the complainant because of her hair and slender build, and because "the tracking app said I was right there." Less than a minute passed between when Chowdhury approached the van and when the van sped away.

Chowdhury indicated that the tracking app lost the signal once defendant sped away. He then called the complainant's boyfriend, Jim. They met and together began looking for the complainant. Hours later the tracking app picked up the signal from the complainant's phone. Chowdhury and Jim drove toward the signal. They made multiple attempts to call her as they did so. Eventually, Chowdhury and Jim circled the area in which the app indicated that the complainant was located. They stopped near a house from where they had seen several vehicles coming and going. After additional attempts to call the complainant, a male answered the phone and declined to bring the complainant out of the home until Jim "said that it's either you bring her

out to us, or you bring her out to the police, who will be here." Shortly thereafter, the complainant came out of the house in the company of defendant. According to Chowdhury, the complainant:

> was crying, and Defendant was trying to explain to me that oh, they know each other, that nothing had happened, you know, they know each other from AA and they're just friends and they're hanging out. And [the complainant] was just, you know, traumatized and crying.

Following the close of proofs and argument, the district court bound over defendant to circuit court on the two CSC-III charges. However, the judge declined to bind over defendant on the kidnapping and the related CSC-I charges, reasoning:

> The Court has listened to the testimony, most especially of the complaining witness, [the complainant], who testified that on September 19th, 2018, in the city of Ann Arbor, near the Blake Transit Center, she ran into the Defendant who was accompanied by another person who she knew, who – whom she had met in recovery. That she had started up a conversation with them, agreed to get in the car with them, ostensibly for a ride home. There were three gentlemen.

> She had stopped and gotten herself a pint or a half pint at the beer store, or the party store, that was nearby. The – after drinking, things became kind of fuzzy for her. I do wanna state at the outset, I found her testimony to be credible to the extent, in two ways. One, as to what she could remember, she appeared to be very credible and forward in her answers. She also appeared to be credible in stating when she simply could not remember something. And that's important because we don't want people making things up or filling in gaps of – of their memory when they simply can't remember something.

> But the fact is, the testimony regarding the next two or three days is filled with a lot of non-remembrance. And the testimony that she could remember, or the parts of this that she could remember is that she was driven from the bus station to, at least over to Liberty Plaza, where a stop was made. There's no testimony as to what happened at that stop, so I guess we're left to try to figure it out.

> There was a stop then made at a house, I believe, in the city of Ann Arbor where at least two of the occupants either left out or left earlier. The – the witness's testimony was entirely clear on that, but when they got to the stop in Ann Arbor, the witness testified she was taken, but later testified that she walked from the car into the house with the Defendant and saw lots of drug activity going on. And at some point, again, all though she testified she was taken, there was no evidence as to what that really meant, whether the Defendant ever placed a hand on her or ordered her, or forced her to go into the bedroom, but that the two of them went to the bedroom together.

> It is her testimony that while they were there, that he started becoming physical, started taking her clothes off, and she expressed to him that she was [sic, not?] interested in a physical relationship with him, but that did not keep him from

-4-

going to the point where she stated sex was happening. He had inserted his penis into her vagina. She kept saying no. She kept telling him she didn't want this.

And then after the sex, him telling her to get out. She remained with him. And sometime, over the period of the day, she was taken to different places. She ended up in a van. And again, gaps as to what happened between leaving the house in Ann Arbor, and at some point, ending up in a van, but in the van was with him and only him. Feeling very out of it, stated she didn't feel like she had a choice, didn't feel like she could walk away. Yet, 24, 48 hours go by and then they end up at a house, maybe in Ypsilanti, somewhere in Washtenaw County, and it was at this house that, again, the Defendant, according to her testimony, took her upstairs. All though, what she recalls is that she was unconscious and that when she came to, the Defendant was on top of her, again, engaged in sexual intercourse with her by having his penis in her vagina. That there was some talk after that.

At this point, her friend searching for her with finding app on her phone, had located her for the second time, but this time, coming and – and removing her from the place. She got in the car, went with then, went to the hospital, got tested. And now, we do have the lab report in now. So I will work backwards from the complaint.

Regarding Counts IV and V, the Court finds probable cause to believe that these crimes were committed and that the Defendant committed them. It is, the Court finds again, that there's probable cause in the first instance that her telling him no and him re-engaging in sex anyway, was sex being accomplished without her consent and with force and coercion, as to the second act while she was physically helpless, while she was unconscious and unable to do anything, other than tell him to stop when she woke up. So, the Court finds that the Criminal Sexual Conduct in the Third-Degree elements have been met.

Count III Kidnapping, the Court simply does not find any evidence in this record that the type of restraint that is necessary for kidnapping was used. And the statute makes it clear that it doesn't require any certain type of restraint, or that the restraint even lasts for any particular period of time.

However, the fact of the matter is, given what the complaining witness could testify, the Court heard no evidence that there was any physical restraint, that there was any emotional restraint, that there was any weapon fashioned, that there was any of the coercion that one would expect to find with restrain as defined in a kidnapping case. And so, without any evidence of restraint, the Court will dismiss Count III. And, therefore, will also dismiss Counts I and II, since Counts I and II are premised on the fact that kidnapping would have happened – would have had to happen to elevate the – the crimes in this case, which are listed in Counts IV and V to First Degree from Third Degree.

So, the Court is dismissing Counts I, II, and III. The Defendant is bound over on Counts IV and V.

Following bindover, on February 10, 2023, the prosecutor moved to amend the information to reinstate Counts I, II, and III, as originally charged.

The circuit court convened a hearing on the prosecutor's motion on March 2, 2023. After the assistant prosecutor indicated her intent to rely on the contents of her motion and amended motion, the judge denied the prosecutor's motion from the bench without hearing defendant's counterarguments. She explained:

> Before the Court is prosecution's motion to reinstate count three, kidnapping and, therefore, counts one and two CSC in the first degree. Bind overs can only be reversed where there is an abuse of discretion and the Court looks to *People versus Yost*, 400, 68 Mich, 122 a 2003 case.
>
> There may be circumstances where there may be more than one reasonable and principled outcome and if a district court selects one of those principled outcomes it has not abused its discretion, People versus Anderson, 501 Mich 175, a 2018 case.
>
> An abuse of discretion occurs when an unbiased person considering the facts that the trial court relied on in making its decision would conclude that there was no justification for that decision. People versus Orzame, 224 Mich App 551, a 1997 case.
>
> Here, the Court is persuaded that an abuse of discretion did not occur. A person or I should say that I wasn't persuaded that an abuse did occur.
>
> A person commits the crime of kidnapping if he knowingly restrains another person with the intent to commit certain felonious acts. MCL 750.349(1).
>
> Restrain means to restrict a person's movements or confine the person so as to interfere with that person's liberty without that person's consent or without legal authority. MCL 750.349(2).
>
> The prosecution relies heavily on an unpublished case, People v Gill, 2014 case cited in their brief where Gill fraudulently induced a thirteen year old into his car ostensibly to give her a ride to school. Instead he immediately drove to two locations where he sexually assaulted her.
>
> In Gill that defendant's intention to assault was clear since he knew the location of the school, diverted from it and the assaults occurred directly after she got into his car.
>
> Here, the testimony from the preliminary exam shows that the alleged victim got into defendant's car to get a ride home because she trusted one of the passengers. At no point did she give directions or an address to the driver.
>
> The driver, Mr. Smith, made multiple stops. The alleged victim made no attempt to leave the car during those stops. There was no testimony that she was

prohibited from getting out of the car. And there was no testimony that the defendant did anything to conceal the fact that they were not going to her home.

She also had an opportunity to leave the car since two of the other occupants which included the one gentleman that she did know left the car at some point.

There was no testimony that Mr. Smith did something to make her stay in the car. She had a pint of her own vodka which she consumed. She thought she was under the influence of something stronger. If she had been given a drug there was no indication of which, if any, of the three men in the vehicle might have provided that to her.

Now while a trier of fact could possibly conclude based on circumstantial evidence that the defendant restrained the alleged victim, another possible and reasoned interpretation of the testimony is that she was free to leave at any of the multiple stops made along the way to the scenes of the alleged assaults and that by remaining in the car she may have consented to the drive around.

There was no testimony that he forced her to stay in the car, lied to her about their destination or carried or forced her to enter his vehicle or either of the two homes.

Because the district court Judge reached a principled and reasonable outcome it did not abuse its discretion and the motion to reinstate is denied.

According to the prosecution, the district judge's decision to dismiss these charges stems from the erroneous construction and application of the kidnapping statute by adding elements to the statutory offense, i.e., the restraint must be accomplished through physical or emotion means, through use of a weapon, or through coercion. Moreover, there was ample evidence adduced at the preliminary examination to establish probable cause to believe that defendant restrained the complainant during the two-day period at issue. Defendant repeatedly failed to take the complainant home, despite her repeated requests to be taken home. She willingly entered the vehicle under false pretenses, as defendant's actions reflect an intent not to take the complainant to her intended destination. He continued to keep the complainant drunk or high and passing in and out of consciousness during the time she was with defendant. Further, the complainant was without a means of transportation and alone with defendant. When Chowdhury attempted to rescue the complainant, defendant sped off instead. Defendant also took the complainant's phone from her and turned off the location tracker. He took her purse and all her belongings and refused to release the complainant to her friends until he was threatened with police involvement. Thus, the prosecution argues, all these facts, when viewed together, establish restraint as contemplated by the kidnapping statute.[2]

---

[2] We presume defendant does not concur with the assertions of the prosecutor; however, defendant did not file a brief in this matter.

## II. ANALYSIS

"A trial court may amend the information at any time before, during, or after trial in order to cure a variance between the information and the proofs as long as the accused is not prejudiced by the amendment and the amendment does not charge a new crime." *People v Stricklin*, 162 Mich App 623, 633; 413 NW2d 457 (1987). "The court before, during, or after trial may permit the prosecutor to amend the information unless the proposed amendment would unfairly surprise or prejudice the defendant." MCR 6.112(H); see also MCL 767.76; *People v McGee*, 258 Mich App 683, 686-687; 672 NW2d 191 (2003). A trial judge's decision to grant a motion to amend the information is reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 221; 749 NW2d 272 (2008), lv den 482 Mich 1027 (2008). An abuse of discretion occurs when a trial judge's decision falls outside the range of principled outcomes. *People v Al-Shara*, 311 Mich App 560, 566; 876 NW2d 826 (2015), lv den 499 Mich 861 (2016). A trial judge also necessarily abuses his or her discretion when he or she commits an error of law. *Id*.

When reviewing a district court's bindover decision, the appellate courts review the district court's determination regarding the sufficiency of the evidence for an abuse of discretion, but review the court's rulings concerning questions of law de novo. *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011); *People v Flick*, 487 Mich 1, 9; 790 NW2d 295 (2010). A reviewing court must consider the entire record of the preliminary examination. It may not substitute its judgment for that of the magistrate, and may reverse only if it appears on the record that the magistrate abused his or her discretion. *People v Henderson*, 282 Mich App 307, 312-313; 765 NW2d 619 (2009), lv den 485 Mich 871 (2009); *People v McKinley*, 255 Mich App 20, 25; 661 NW2d 599 (2003).

A magistrate must bind over a criminal defendant for trial in the circuit court if, at the end of a preliminary examination, the magistrate concludes that a felony has been committed and there is probable cause for charging the defendant with the commission of that felony. MCL 776.13; *People v Yost*, 468 Mich 122, 125; 659 NW2d 604 (2003). "Probable cause requires a quantum of evidence 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief' of the accused's guilt." *Yost*, 468 Mich at 126, quoting *People v Justice (After Remand)*, 454 Mich 334, 344; 562 NW2d 652 (1997). To establish that a crime has been committed, a prosecutor need not prove each element beyond a reasonable doubt, but he or she must present some evidence of each element. *Yost*, 468 Mich at 126; *Henderson*, 282 Mich App at 312. Circumstantial evidence and reasonable inferences from the evidence can be sufficient. *Henderson*, 282 Mich App at 312. So long as the evidence is relevant and admissible, it does not matter that evidence gives rise to multiple inferences or that an inference gives rise to further inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002); *People v Lowery*, 274 Mich App 684, 691; 736 NW2d 586 (2007) (applying the rule in the context of bindover decision). An inference is a conclusion reached by considering other facts and deducing a logical consequence from those facts. *Baranski v Lorenger*, 15 Mich App 315, 317; 166 NW2d 470 (1968). "It is not the function of the district court to discharge the accused when the evidence is conflicting or raises a reasonable doubt with regard to guilt. Such questions are for the trier of fact." *People v Selwa*, 214 Mich App 451, 469; 543 NW2d 321 (1995), lv den 453 Mich 937 (1996).

The prosecutor charged defendant with kidnapping under MCL 750.349(2). A kidnapping occurs when, in relevant part, a person "knowingly restrains another person with the intent to . . . [e]ngage in criminal sexual penetration or criminal sexual conduct prohibited under . . . [MCL 750.520a et seq.] with that person." MCL 750.349(1)(c); *People v Anderson*, 331 Mich App 552, 562; 953 NW2d 451 (2020). To "restrain" means to

> restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts. [MCL 750.349(2); see also *Anderson*, 331 Mich App at 562.]

Based on the evidence described above, the district court ruled that there was no evidence "of the type of restraint that is necessary for kidnapping." The district court described the types of restraint that would satisfy the kidnapping statute as physical or emotional restraint, coercion or "weapon fashioned." The court further observed that there was no showing that defendant placed a hand on the complainant, or that he ordered or forced her into the bedroom where he sexually assaulted her. Because the prosecutor failed to show that defendant used those "types" of restraint, the district court ruled that the prosecutor failed to meet the probable-cause showing that defendant restrained the complainant.

On appeal, the prosecutor argues that the district court erroneously read into the language of the kidnapping statute an evidentiary requirement that a prosecutor must show that the defendant used physical force, emotional tactics, coercion, or a weapon to restrain a person under the kidnapping statute. As noted, "restrain" is defined by MCL 750.349(2), and that definition controls. *Anderson*, 331 Mich App at 562. See also, *People v Williams*, 288 Mich App 67, 74; 792 NW2d 384 (2010). The prosecutor only had to present evidence that defendant restricted the complainant's movements so that he interfered with her liberty without her consent. Accordingly, to the extent that the district court suggested that MCL 750.349(2) requires evidence of the use of physical force, a weapon, or emotional or coercive tactics, that is not required pursuant to the plain language of the statute and was error.

To the extent that the district court was simply listing *examples* of what might constitute restraining behavior, the court failed to consider that the term "restrain," as defined, is broad enough to include other conduct, including some of the conduct shown in this case. Here, the district court found that the complainant's testimony was credible, which is a determination to be made by the court during the preliminary examination. See, *People v Anderson*, 501 Mich 175, 178; 912 NW2d 503 (2018). The complainant testified that she got into defendant's vehicle because the men said that they would drive her home. The complainant stated that she got in the front seat and planned to direct defendant how to get to her apartment. She also testified that, when she got into the vehicle, "there was discussion about them taking [her] home." Defendant did not take the complainant to her apartment but instead made a series of drug transactions from his vehicle around Ann Arbor.

When a defendant claims that an alleged victim of kidnapping consented to the confinement, a prosecutor may counter this with a showing that the defendant obtained that consent by fraud. *People v La Porte*, 103 Mich App 444, 448-449; 303 NW2d 222 (1981). As discussed,

the complainant got into the vehicle for the limited purpose of obtaining a ride to her apartment. Defendant did not take the complainant to her apartment, there exists from this record a reasonable inference that defendant confined the complainant with a fraudulent promise that he never intended to keep. On the basis of what occurred over the days of defendant's custody of the complainant, a person of ordinary prudence and caution could believe that defendant did this with a plan to sexually assault her. Because credible testimony established a reasonable inference that defendant restrained the complainant, the prosecutor established probable cause to support the kidnapping charge.

Although the prosecutor did not present toxicological tests showing the presence of drugs in the complainant's system, the complainant testified that she felt drugged, that she felt that something was wrong with her, and that the amount of alcohol that she drank would not have caused those disabling effects. Based on this evidence, there arises a reasonable inference that the complainant was drugged. Also, the activities that the complainant described suggested that the "stops" that defendant was making involved the sale or purchase of drugs. Accordingly, evidence supported an inference that there were drugs in the vehicle after the complainant got inside it. On the basis of the evidence, a reasonable person could infer that the open container given to the complainant in the car could have contained a drug for the purpose of incapacitating her so that defendant could engage in a sexual assault. Drugging the complainant without her consent would qualify as restraint for purposes of the kidnapping statute because doing so severely limited the complainant's ability to move freely, including her ability to get out of the vehicle or to walk away from defendant.

Alternatively, even if the complainant voluntarily stayed in the vehicle with defendant, the complainant testified that she told defendant that she wanted to leave when defendant took her to the apartment at which the first sexual assault occurred. Evidence showed that, by the time they arrived, the complainant was feeling drugged and very blurry, and while there, she fell in and out of consciousness. Nonetheless, the complainant told defendant that she did not want to be there and that she wanted to go home. Defendant ignored the complainant's requests and, instead, took her to a bedroom and sexually assaulted her while she was semiconscious. Arguably, defendant was restricting the complainant's ability to leave on her own by taking her to and keeping her in a darkened apartment in a location unknown to her, while surrounded by people engaged in illegal activities. That the complainant was either drugged or heavily intoxicated at the time would have contributed to a conclusion that the complainant could not safely leave.

Chowdhury's testimony also established a reasonable inference that defendant was attempting to restrain the complainant's freedom to leave. Chowdhury tracked the complainant's phone to downtown Ann Arbor, and he found defendant driving with someone who looked like the complainant passed out in the front seat of his van. When Chowdhury tried to get a better look at the person, defendant repeatedly drove forward to prevent him from doing so, and as soon as defendant learned that Chowdhury was looking for a blonde woman, defendant quickly drove away. Thereafter, when Chowdhury and Jim found the complainant's location in Ypsilanti, defendant refused to let the complainant leave his house until the boyfriend threatened to call the police. This evidence supports a reasonable inference that defendant took steps to keep the complainant away from people trying to help her get to a place of safety. The complainant also testified that she asked defendant for her phone so that she could contact someone to help her get out of the house in Ypsilanti, but defendant refused to give her the phone. The complainant did

not know how or when defendant took her phone, but she believed that he had it, and this belief is supported by Chowdhury's testimony that it was defendant who answered the phone when the boyfriend and Chowdhury were finally able to reach someone after repeatedly calling the complainant.

A trial court is authorized to amend an information before, during, or after trial, pursuant to MCL 767.76 and MCR 6.112(H), unless doing so would unfairly surprise or prejudice the defendant. *People v McGee*, 258 Mich App 683, 686-689; 672 NW2d 191 (2003). Defendant did not claim that an amendment would be unfair or prejudicial, and as previously pointed out, he offers no argument on appeal on this issue or any other. The district court's ruling that there was no evidence of restraint was based on a legal error that placed a burden on the prosecutor to show that defendant used force, a weapon, or overtly coercive conduct to meet the restraint requirement. MCL 750.349(2) refers only to a restriction of movement or confinement enough to interfere with a person's liberty. Because the district court's ruling was legally erroneous, and because the prosecutor presented enough evidence at the preliminary examination to establish probable cause regarding restraint as defined in MCL 750.349(2), the district court abused its discretion when it declined to bind over defendant on the kidnapping charge as well as the counts of CSC-I that depended on kidnapping as the underlying felony. See *Duncan*, 494 Mich at 723. Moreover, because credible testimony established a reasonable inference that defendant restrained the complainant by keeping her confined without her consent to sexually assault her, the trial court erroneously denied the prosecutor's motion to amend the information.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Stephen L. Borrello
/s/ Kathleen A. Feeney