# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 11, 2015

Plaintiff-Appellee,

v

No. 321330
Van Buren Circuit Court

RAY EDWARD BARRY,

LC No. 13-018741-FC

Defendant-Appellant.

Before: TALBOT, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

A jury convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a), and he was sentenced to life imprisonment. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

On December 9, 2002, the 19-year-old victim, Christopher Green (Chris), was murdered on 60th Street in Bangor, Michigan. He had suffered multiple stab wounds, as well as blunt force trauma to the head. The case went "cold" and was not solved until 2011. It was the prosecution's theory that defendant killed Chris because he was jealous of Chris's relationship with their neighbor, Lisa Cousins (Lisa). It was the defense's theory that Lisa's angry and abusive father, Floyd Cousins (Floyd), was the true murderer. There was no real physical evidence connecting defendant to the crime, but he confided in at least three individuals that he was the one who killed Chris. Additionally, footprint castings taken at the scene of the crime matched the type of tennis shoes that defendant owned near the time of the murder.

## II. MOTION TO QUASH

Defendant argues that the district court abused its discretion in binding over defendant to the circuit court on open murder charges and that the circuit court then erred by refusing to quash the information. Defendant points to the fact that there was no physical evidence or eyewitness testimony linking defendant to the killing and that the bindover was based primarily on the unreliable statements defendant made to his half-brother, Claude Taylor (Claude). Defendant argues that Claude's testimony was incredible because he only testified to secure leniency in his prosecution on unrelated criminal charges. Defendant maintains that the district court misapprehended its role and refused to weigh the credibility of the witnesses before it. We disagree.

-1-

A decision to bind over a defendant is reviewed for an abuse of discretion. *People v Flick*, 487 Mich 1, 8-9; 790 NW2d 295 (2010); *People v Henderson*, 282 Mich App 307, 312; 765 NW2d 619 (2009).

> In reviewing the bindover decision, a circuit court must consider the entire record of the preliminary examination and may not substitute its judgment for that of the district court. The decision to bind over a defendant may only be reversed if it appears on the record that the district court abused its discretion. This Court also reviews the bindover decision de novo to determine whether the district court abused its discretion. Thus, this Court gives no deference to the circuit court's decision. [*Henderson,* 282 Mich App at 312-313 (internal citations omitted).]

"A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Waterstone*, 296 Mich App 121, 131-132; 818 NW2d 432 (2012).

The primary function of the preliminary examination is to determine whether a crime has been committed and, if so, whether there is probable cause to believe that the defendant committed it. *People v Plunkett*, 485 Mich 50, 57; 780 NW2d 280 (2010). If, at the conclusion of the hearing, it appears to the magistrate that there is probable cause to believe that a felony has been committed and that the defendant committed it, the magistrate must bind over the defendant for trial. MCL 766.13; MCR 6.110(E); *People v Corr*, 287 Mich App 499, 502-503; 788 NW2d 860 (2010).

Probable cause that the defendant has committed the crime is established by evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt. *Plunkett*, 485 Mich at 57. To establish that a crime has been committed, a prosecutor need not prove each element beyond a reasonable doubt, but he must present some evidence of each element. *Henderson*, 282 Mich App at 312. Circumstantial evidence and reasonable inferences from the evidence can be sufficient. *Id.*

Defense counsel objected to the prosecutor's request to bind defendant over on an open murder charge, arguing that the prosecution presented only unreliable statements that defendant allegedly made to third parties. Antonio Harris (Antonio), to whom defendant allegedly admitted he killed Chris, testified that he did not take defendant seriously because he was always trying to make himself a part of the story. Claude was motivated by self-interest and that the admission defendant made to Claude was made while the two were drinking alcohol and smoking marijuana. The prosecutor responded: "We believe credibility of witnesses in this case is to be decided by the jury if you find that there's probable cause based on the statements and we think that we don't have an extraordinary issue regarding credibility here."

The district court concluded:

> First, based upon the testimony of [the pathologist], I can find that the cause of death was the multiple stab wounds . . .

> The question then becomes where do we go from there and this is a probable cause hearing. This is not a proof beyond a reasonable doubt. The

Court has always taken the position that credibility is one for the trier of fact and not for this Court. That's what I've always held in the last ten-plus years and what I'm going to do today.

Many of the arguments, Mr. DuBay [defense counsel], that you make in this matter are arguments that will be raised in front of the jury in this matter because this Court can easily find probable cause that back on December 9th, 2002, Ray Edward Barry was in Geneva Township, Van Buren County, and based upon his own statements, he beat up, stabbed, and chased Mr. Green down. He thought Mr. Green was – yeah, was breaking into the house. That was one conversation he had with Mr. [Claude] Taylor. Another conversation was that, um, he was told by Green, please don't kill me several times as he was beating him and stabbing him. This Court can easily find probable cause that Mr. Barry did murder, caused the death of Christopher Green, that it was not justified, and based upon the actions that first degree, premeditated murder would be – could be substantiated by the record at this point in time so I am going to bind over Mr. Barry.

In the circuit court, defendant moved to quash the information, making the same arguments as in the district court. Importantly, defense counsel also argued that the district court misunderstood its role by refusing to assess the credibility of the witnesses. In denying defendant's motion to quash, the trial court noted that it had "no right to substitute its judgment for that of [the] District Court."

We agree that the district court did not abuse its discretion in binding defendant over for trial. Contrary to defendant's contention, the district court did not summarily refuse to consider the witnesses' credibility; instead, he noted that any questions related to credibility, including potential impeachment, were for the ultimate trier of fact. Although the magistrate may weigh the credibility of the witnesses, if the evidence conflicts or raises a reasonable doubt, the defendant should be bound over for resolution of the questions by the trier of fact. *Henderson*, 282 Mich App at 312; see also *People v Yost*, 468 Mich 122, 128; 659 NW 2d 604 (2003) (while "a magistrate in determining whether a crime has been committed has not only the right, but the duty, to pass judgment on the credibility of the witnesses . . . we have also instructed examining magistrates to not refuse to bind a defendant over for trial when the evidence conflicts or raises reasonable doubt of the defendant's guilt."); *People v Goecke*, 457 Mich 442, 469-470; 579 NW2d 868 (1998) ("It is not . . . the function of the examining magistrate to discharge the accused when the evidence conflicts or raises a reasonable doubt of the defendant's guilt; that is the province of the jury."); *People v Redden*, 290 Mich App 65, 84; 799 NW2d 184 (2010) ("If the evidence conflicts or raises a reasonable doubt concerning the defendant's guilt, the defendant should nevertheless be bound over for trial, at which the trier of fact can resolve the questions.").

In addition, defendant attacks Claude's credibility but is silent on the remaining testimony from the preliminary examination. Even if Claude cooperated with the prosecution out of self-interest, his testimony was supported by the testimony of two other witnesses – Jeanine Black (Jeanine) and Antonio – both of whom heard incriminating statements from defendant. There was no question that Chris was murdered. Defendant lived in close proximity

to where the murder occurred and also made several incriminating statements. Therefore, the district court did not abuse its discretion in binding over defendant for trial and the trial court did not err in refusing to quash the information. Additionally, as will be discussed further below, "[i]f a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover." *People v Wilson*, 469 Mich 1018; 677 NW2d 29 (2004)

### III. LOST EVIDENCE

Defendant next argues that the trial court should have dismissed the charges against defendant once it was discovered that critical evidence was lost. We disagree.

"A trial court's decision on a motion to dismiss is reviewed for an abuse of discretion." *People v Hartwick*, 303 Mich App 247, 255; 842 NW2d 545 (2013) app gtd 496 Mich 851 (2014). Defendant's claim that he was denied due process is reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

Crime scene technicians removed Caucasian hairs from the victim's left hand. The Michigan State Crime Lab did not perform mitochondrial testing, so, at defense counsel's request, the trial court entered a consent order authorizing such testing up to $4,000 at Speckin Forensic Laboratory – a lab that was mutually agreeable to both defendant and the prosecutor.

Thereafter, defendant moved to quash the information and dismiss the case with prejudice because the hairs never arrived at Speckin Lab. For his part, the prosecutor filed a motion in limine to preclude defendant from referring to any lost evidence during trial. At the hearing on the motions, defense counsel pointed out that the police had opted to send the samples via first-class mail as opposed to personally transporting the evidence. He argued that the evidence was critical, in part, to combat the prosecutor's claim that the hairs may have belonged to Chris. Counsel stated that "hair is not found in defensive wounds when it is your own hair" and testing may have bolstered defendant's theory of third-party culpability. The trial court noted that the fact that the hairs were allegedly Caucasian could be presented at trial, even absent a lab confirming as much. Defense counsel maintained that arguing it was a Caucasian hair would not have the "same force" as the lab results confirming that assertion. He maintained that, regardless of whether the actions of the police were intentional, reckless, or otherwise, defendant was entitled to the same remedy – dismissal. The prosecutor explained that the postal server signed the received receipt on behalf of Speckin Labs (as was his practice) because he was trying to do the lab a favor, leaving the envelope in a drop box. There may have been some criminal act of a third party that prevented the lab from testing the envelope or it may have been the lab's own lackadaisical treatment of evidence.

The trial court denied defendant's motion to dismiss and also denied the prosecution's motion in limine. It ruled:

The Court finds in this case that the evidence was not – is not established to be clearly materially exculpatory. As indicated in the prosecution's brief, the fact that it is a Caucasian hair is still coming into evidence. The defense acknowledges that we don't know what these results would have been and the

-4-

defense acknowledges that it could have been the decedent's hair and that would not be exculpatory.

Is this unfortunate? Certainly this is unfortunate. Can both sides – would both sides have liked the advantage of this result once the Court ordered the testing? Certainly.

The Court obviously does not approve of the missing evidence, but the question for the Court is first, whether or not the defense has established it to be clearly materially exculpatory and I don't believe that the Defense has because we don't know what the results are. One result if it were the decedent's hair, it would not have helped the defense. And any way, in fact, it is probably more helpful to the defense to be able to argue that we don't know whose hair it is than to have a result that it was the decedent's hair. So, the defense has not met that burden.

The next question is whether the defense has been able to show bad faith on behalf of the police or the government. And the Court finds there was no bad faith, that simply this is literally a case of evidence being lost in the mail. Nothing has been presented to the Court that the chain of custody method chosen in this case was somehow an intentional deviation from policy and procedure with the hope that the evidence would be lost. There has been an argument in that regard, but I have nothing to substantiate that argument. The U.S. mail certified receipt is a legitimate and reliable service and no one would have expected that the U.S. postal service person would drop it in a box and sign himself as the person receiving the evidence. I don't think anyone could have possibly anticipated this result, including the police or the government.

So, your request for dismissal because of the lost evidence through no fault of either the defense or the prosecution is denied.

The trial court denied the prosecutor's motion to keep the missing evidence from the jury, saying "the Jury is going to hear about this hair." The prosecution was precluded from suggesting that the lab was negligent. Instead, the trial court wanted the jury to hear that the evidence was attempted to be tested and, through no fault of either party, it was lost.

After eliciting evidence that the hairs had been lost and, therefore, never tested, defense counsel argued during closing:

You know, the Prosecutor says it's – it's too bad that the Caucasian head hair is lost and it really is. I don't know why it wasn't tested years ago. Enforcement knows that in the course of a struggle, somebody trying to save their life, they're tugging and pulling, they're grabbing, they're clawing. They're going to grab some head hair and, lo and behold, the victim, the decedent in this case, had head hair stuck to his hands. It wasn't – it wasn't just head hair. It was Caucasian head hair. Now the Prosecutor can say, well, very easily, well, that was just – that was just Chris'[s] hair. Well, if it's Chris'[s] hair, test it and show it to us. Prove it to us. Why does defense have to ask for that? The reason they

-5-

didn't test it is because if it was Chris'[s], it wouldn't help their case, it was just Chris'[s]. But if it wasn't Chris'[s], now the focus is off Ray because if it's Caucasian head hair and the last time I looked, Ray's not Caucasian. That's why they didn't want to test it. That's why it wasn't tested.

Later, the trial court instructed the jury: "There [has] been reference made to hair samples labeled L-29 and L-30. There has been evidence that these hair samples were ordered to be tested. Through no fault of either the prosecutor or the defense, in the process of transfer for testing, these items were lost in the mail."

"A criminal defendant can demonstrate that the state violated his or her due process rights under the Fourteenth Amendment if the state, in bad faith, failed to preserve material evidence that might have exonerated the defendant;" however, "[i]f the defendant cannot show bad faith or that the evidence was potentially exculpatory, the state's failure to preserve evidence does not deny the defendant due process." *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012). Thus, where evidence is of unknown probative value, and only *potentially* exculpatory, loss of the evidence denies due process only when the police act in bad faith. *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988). The United States Supreme Court explained:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady* [*v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in [*California v*] *Trombetta*, 467 US [479,] at 486, 104 S Ct at 2532, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause [] as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. [*Youngblood*, 488 US at 57-58.]

-6-

Importantly, "[d]efendant bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith." *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992).

Defendant failed to show that the evidence was exculpatory. As the trial court aptly noted, this was not a situation where the exculpatory nature of the evidence was readily apparent before it was lost. The hairs may have belonged to any number of Caucasian individuals, including Chris himself. The fact that the hair may have belonged to another party did not negate the fact that defendant had confessed to being the killer.

In addition, defendant failed to show evidence of bad faith on the part of the police or the prosecution. The record revealed that the hair fibers were not available because they were lost. It was a postal worker's interference that prevented the evidence from being tested. Defendant has not produced any evidence suggesting that the prosecution or the police actively suppressed the evidence or that they undertook any effort to prevent defendant from having the evidence tested. Rather, on this record, the evidence suggested that the evidence was lost through no fault of either party.

Finally, defendant was not entitled to an adverse inference jury instruction. An adverse jury instruction regarding missing evidence is only appropriate where bad faith has been shown. *People v Davis*, 199 Mich App 502, 514; 503 NW2d 457 (1993), overruled on other grounds in *People v Grissom*, 492 Mich 296; 821 NW2d 50 (2012).

In conclusion, the trial court did not abuse its discretion in denying defendant's motion to dismiss the charges. The exculpatory value of the evidence was not readily apparent and there was no bad faith. Given the lack of bad faith, defendant was not entitled to an adverse inference jury instruction.

## IV. MRE 404(b) EVIDENCE

Defendant argues that the trial court abused its discretion when it refused to allow defendant to present evidence that Floyd had previously choked his daughter with a wooden stick because such evidence would have supported defendant's theory that Floyd, not defendant, was the killer. We disagree.

"A trial court's discretionary decisions concerning whether to admit or exclude evidence will not be disturbed absent an abuse of that discretion. When the decision involves a preliminary question of law[,] however, such as whether a rule of evidence precludes admission, we review the question de novo." *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010) (internal quotations and footnotes omitted).

When the trial court granted defendant's motion to introduce evidence of third-party culpability, it warned defense counsel that the same rules of evidence would apply: "So by no means in this ruling am I ruling that you are not bound by the same rules of evidence that the prosecution is bound to in this case."

At a January 16, 2014 hearing, defense counsel sought to have the testimony of Beth Blomquist (Beth) admitted under MRE 404(b). Beth allegedly witnessed Floyd Cousins use a

small tree branch to physically assault another person. Chris died of blunt force trauma with a tree branch lying across his body and defense counsel argued that Beth's testimony was relevant to show scheme, plan, or system of doing an act. The trial court asked defendant to call Beth as an offer of proof. Beth did not remember the date of the incident, but she remembered seeing Floyd assault his daughter, Bobbie. He had been drinking and got "upset at Bobbie for something" and "choked her on the table with this long thick stick, it was the wood poker." Beth described the object as "like a tree branch" with the bark taken off. She was scared for Bobbie because Floyd was strangling her.

In denying defendant's motion, the trial court noted:

> Okay. Defendant seeks to introduce this evidence as indicated in the notice under 404(b) stating that the evidence shows a plan or scheme or some type of modus operandi of Floyd Cousins or a signature crime, if you will. The Court finds that – that the threshold has not been met in this case. The Court finds that although it may show him to be assaultive, it's not being sought to be introduced under any theory of that nature. The Court finds there is insufficient evidence to show a signature crime. The previous incident involved a tool that had been used for another purpose, and a choking incident. This case bears none of that. It's a stabbing case. There is some blunt trauma, and there is a tree branch on the body. So I don't think that we have the sufficient and significant nexus necessary to allow it in. As well, and in addition, the Court finds that any probative value of that testimony would be outweighed by confusion of the issues and unfair prejudice in this case so that evidence will not be allowed.

On appeal, defendant argues that that evidence of Floyd's attack on Bobbie was admissible under MRE 404(b)(1), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

To be admissible under MRE 404(b), generally bad acts evidence: (1) must be offered for a proper purpose, (2) must be relevant, and (3) must not have a probative value substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the actor's character to show his propensity to commit the offense. *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993), mod 445 Mich 1205 (1994). The court rule applies to the admissibility of evidence of "a person" and, therefore, is not strictly limited to criminal defendants. *People v Rockwell*, 188 Mich App 405, 410; 470 NW2d 673 (1991).

Defendant argues that evidence of Floyd's altercation with Bobbie was admissible to prove identity. When introduced to establish identity, the party seeking to introduce the evidence

-8-

has the heavy burden "to show that the manner in which the crime charged and the other crimes were committed was marked with special characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of the [the same individual] because all bore his distinctive style or 'touch'." *People v Golochowicz*, 413 Mich 298, 325; 319 NW2d 518 (1982).[1]

> Where . . . the only conceivable justification for admission of [] similar-acts evidence is to prove the identity of the perpetrator, the link is forged with sufficient strength to justify admission of evidence of the separate offense only where the circumstances and manner in which the two crimes were committed are "[s]o nearly identical in method as to earmark [the charged offense] as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The [commonality of circumstances] must be so unusual and distinctive as to be like a signature." McCormick, Evidence (2d ed), § 190, p. 449.

> It is because of the combined value of those two factors, the unique and uncommonly distinctive style employed by the [actor] in committing the "substantially proved" uncharged similar offense, and the same distinctive modus operandi employed in the charged offense, that the jury is permitted to infer, if it believes the evidence, that both crimes were the handiwork of the same person . . . [*Golochowicz*, 413 Mich at 321-322.]

The trial court did not abuse its discretion in prohibiting defendant from introducing evidence of Floyd's encounter with Bobbie in order to show that Floyd was the true killer. The two offenses were distinct. In the incident with Bobbie, Floyd allegedly choked her with a stick that the family used for its wood stove. There was no evidence that Floyd threatened Bobbie with a knife. In contrast, Chris suffered blunt force trauma to the face and head and had been stabbed repeatedly. Although a log was found near the body there was no DNA evidence found on the log showing that it was the instrument that was used to inflict the injuries. The only shared feature between the two acts was aggression. "It will not suffice that the 'like act' be simply another crime of the same general category or even of the same specific character. . . . It is the uniqueness and the distinctiveness with which both crimes were committed, combined with the proof that the [actor] committed the 'like act', that is the key." *Id*. at 311. The proposed other acts evidence in this case were not "marked with special characteristics so uncommon,

---

[1] "Although the *VanderVliet* Court adopted a new test for admission of evidence under MRE 404(b), the four-part test of *People v Golochowicz*, 413 Mich 298, 309, 319 NW2d 518 (1982), remains valid to show logical relevance where similar-acts evidence is offered to show identification through modus operandi." *People v Ho*, 231 Mich App 178, 186; 585 NW2d 357 (1998).

peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of defendant because all bore his distinctive style or 'touch'." *Id.* at 325.[2]

## V. AUTOPSY PHOTOS

Defendant next argues that certain photographs were unduly inflammatory. We disagree.

"The decision to admit or exclude photographs is within the sole discretion of the trial court." *People v Mills*, 450 Mich 61, 76; 537 NW2d 909, *mod* 450 Mich 1212 (1995).

The prosecutor had marked as exhibits 30-36, which were seven autopsy photographs and defendant objected. The trial court ruled:

The Court finds that the – the probative nature of these photographs as they are outweighs any danger of unfair prejudice.

The Court notes that all of the photos are very precise to the wound at hand. There appears to be no attempt to put before the Jury any grandeur photos which might inflame the Jury in any way. The record should reflect I did meet with counsel and the Prosecuting Attorney had available to him a variety of other photographs and after a conference with counsel, the Prosecutor withdrew his request to introduce some other photographs which were frankly a bit more gruesome.

The Defendant has pleaded not guilty to this charge. That puts into issue all of the elements of the offense. Intent to kill is an element of the offense. The nature and the extent of the injuries goes to that element so the Court will allow in the photographs.

The pathologist reviewed exhibits 30-36, which the court received into evidence. Exhibits 30-32 show stab wounds to the body. Exhibits 33-34 show the victim's hands. Exhibit 35 shows the through-and-through scalp injury. Defendant concedes that there is nothing objectionable about any of those photos.

Defendant argues that a picture of the victim's bloody face and a picture of the bloody and battered body were inappropriately admitted into evidence over objection. However, as the prosecutor notes, the image of the victim's body in the body bag was never admitted into

---

[2] Neither does the "doctrine of chances" apply. The doctrine has been used in certain circumstances to show that incidents of unusual events related to an individual are not the result of natural causes. *People v Mardlin*, 487 Mich 609, 616; 790 NW2d 607 (2010). The *Mardlin* Court used the theory in an arson case: "The fires here were admissible precisely because they constituted a series of similar incidents—fires involving homes and vehicles owned or controlled by defendant—the frequency of which objectively suggested that one or more of the fires was not caused by accident." *Id.* at 619.

evidence. While the photograph to which counsel objects is contained on the CD supplied by defense counsel, it is clear from the record that it was never admitted into evidence. The jury never viewed that photo.

Therefore, the only remaining objectionable photo is a close-up of the victim's battered face, showing a laceration to the left side of his nose. Defendant complains that Dr. Hunter's testimony supplied the jury with all it needed to know in terms of the cause and manner of death, however, "photographs are not excludable simply because a witness can orally testify about the information contained in the photographs." *Mills*, 450 Mich at 76. Instead, "[t]he proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *Id.*

> If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors. [*Id.* at 77 (quotation marks and citations omitted).]

The photos were close-up depictions of the stab wounds on the victim's body, including wounds to the victim's hands that Dr. Hunter testified were defensive wounds, and other wounds to Chris's face and head that were fatal. After viewing the photos, we are convinced that their sole purpose was not to inflame the jury. Instead, the photographs were relevant to show that defendant had the intent to commit murder. *Id.* at 80-81 ("photographs were properly admitted by the trial court because they were necessary to show the defendants' intent to kill and to corroborate the testimony of the prosecution's expert . . ."). The photos were clinical and did not contain excessive gore. Additionally, the trial court carefully considered the photos before it determined that they were relevant and not substantially more prejudicial than probative. Its decision did not fall outside the principled range of outcomes.

## VI. *BRADY* VIOLATION

Defendant argues that he was denied due process and was entitled to a mistrial when it was discovered that the prosecution "effectively suppressed evidence that it knew was critical, by not sua sponte flagging" the fact that additional "hair fibers" taken from the victim's hand were never tested. Alternatively, defendant argues that he was denied the effective assistance of counsel when counsel failed to discover the evidence and pursue its relevance. We disagree as to both allegations of error.

"To prevail on a claim of prosecutorial error, a defendant, in general, must demonstrate that he or she was denied a fair and impartial trial." *People v Bosca*, ___ Mich App ___; ___ NW2d ___ (Docket No. 317633, issued March 26, 2015), slip op, p 11 (internal citations omitted).

-11-

"A trial court's decision on a motion to dismiss is reviewed for an abuse of discretion." *Hartwick*, 303 Mich App at 255.

Because there was no *Ginther*[3] hearing, defendant's ineffective assistance of counsel claim is limited to the existing record. *People v Sabin*, 242 Mich App 656, 659; 620 NW2d 19 (2000).

On the third day of trial, the parties addressed defense counsel's motion for sanctions and mistrial regarding evidence sample #21. Defense counsel indicated that he was "shocked" to learn that hair fibers had been removed from the victim's left hand, but never tested. Had counsel known about the hair, he would have demanded that it be tested. Defense counsel stated: "I can certainly be faulted for not specifically opening envelopes, although I'm not – I did have access to them. The Prosecutor at some point last week made an offer in that regard, but he was going to do a list and it's from that list that this discovery was made so, [] the Prosecutor did provide a list of evidence. I just wasn't aware that there was evidence separate and apart from all of the evidence reports I received from the crime lab. I guess call me naïve in that regard . . ." The evidence report showed the sample as "evidence not tested."

The prosecutor believed the evidence was collected at the autopsy and sent to the lab to see if there was anything of evidentiary value.[4] He noted: "I have to rely on the investigators in the lab that they're going to test everything that's either exculpatory or incriminating or relevant to the facts of the case so I have." Analyst Paul Donald received those envelopes. "He identified them in a lab report in Exhibit E that [defense counsel] has had all along and in Paul Donald's report he doesn't describe any specifics about what's in the envelope, but he clearly puts all of us on notice that he's got a bunch of evidence that ran through his lab that he didn't test . . ." The prosecutor had an assistant conduct a physical rundown of all the evidence and type up a list that would fully disclose the evidence that was in the prosecutor's office.

Defense counsel again noted the potential importance of such evidence:

[I]f I overlooked something, why didn't somebody just say, hey, we've got some more? What's the problem? Now it is a problem because the unique evidence that was identified as Caucasian head hair is truly lost, as I understand it from the – from law enforcement. So what we have left may not be identified as that at all. In fact, they may open it and say, well, that's – that's a cat hair or a dog hair or I don't know what they're going to say it is, but – so it may not be relevant at all and I don't know that I necessarily need all of that testing if visually it doesn't fit the same kind of profile that we originally were concerned about and that is hair from a Caucasian head.

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[4] This was in contrast to the hairs that were previously lost, which were taken from the victim's body at the scene of the crime.

In rejecting defense counsel's request for a mistrial, the trial court noted that both attorneys had the lab reports from the beginning of the case. The trial court found that there was no discovery violation because the prosecutor turned over the evidence it possessed. Nor was there a *Brady* violation because there was no way to prove the evidence was favorable to defendant. The trial court noted that, even if the evidence showed hairs belonging to someone other than defendant, the evidence at trial had demonstrated that the people all had relationships with each other. "They would have all had innocent reasons to come in contact with each other or with each other's home or other areas where hair samples might have transferred from one person to another unconnected to a murder." The trial court again pointed out that defense counsel had the evidence available to him. There being no showing that the prosecutor suppressed favorable evidence, the trial court refused to grant a mistrial or give an adverse assumption jury instruction. The trial court declined to postpone trial until testing could be performed. It ordered that neither side reference the evidence.

In contrast to Issue III above where bad faith is considered when evidence is lost or destroyed, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In order to establish a *Brady* violation, the test is whether "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731, reh den 495 Mich 998 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id.* at 150. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 150, quoting *United States v Bagley*, 473 US 667, 682; 105 S Ct. 3375, 87 L Ed 2d 481 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial.. . ." *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

Defendant cannot demonstrate that the prosecutor suppressed evidence. In fact, defendant concedes that trial counsel had the information since the beginning of the case. Nor can defendant show that the evidence was favorable. Unlike the hairs discussed in subsection III of this opinion, which were specifically identified as Caucasian, there was no preliminary finding regarding these additional "hair fibers." Defendant's claim that the hairs were Caucasian is mere speculation. Even if the hairs had been identified as Caucasian, such evidence was not exculpatory for the same reasons as discussed above. Defendant has not shown that he was deprived of a fair trial due to the absence of the evidence. Defendant confessed his crime to various individuals and the presence of Caucasian hair did not exonerate defendant, especially when there were numerous individuals who had reason to come into contact with one another.

We reject defendant's attempt to fault the prosecutor for failing to "sua sponte" draw attention to evidence that was within defense counsel's knowledge. While it is true that "[a] prosecutor's role within our judicial system is to seek justice and not merely to convict," *People v Meissner*, 294 Mich App 438, 455; 812 NW2d 37 (2011), "[t]he prosecution is not required to seek and find exculpatory evidence or assist in building or supporting a defendant's case, nor is it

-13-

required to negate every theory consistent with defendant's innocence." *Bosca*, slip op, p 14 (internal citations omitted).

Having failed to show a *Brady* violation, defendant argues that he received ineffective assistance of trial counsel when defense counsel admitted that the information was available to him, but that he neglected to pursue it.

> Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions. To establish that a defendant's trial counsel was ineffective, it must be demonstrated that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for the errors committed by counsel, the result of the proceedings would have been different. Effective assistance of counsel is presumed, and a defendant bears a heavy burden of proving otherwise. [*Bosca,* slip op, p 16 (internal citations omitted).]

"[A] claim of ineffective assistance of counsel incorporates both a performance component and a prejudice component. Both prongs must be fulfilled." *Id.* If a defendant claims that defense counsel should have done more with pretrial discovery, an appellate court will not second guess counsel with the benefit of hindsight. *Id.* Defendant must show that the evidence was exculpatory or would have changed the outcome of the proceedings. *Id.*

Trial strategy is not at issue in this case because defense counsel conceded that he had access to the information but underestimated its relevance. The primary consideration, therefore, is whether trial counsel's failure to pursue the matter prejudiced defendant's case. We conclude that it did not. Defendant admitted his crimes to three individuals. He knew Chris and lived near where the crime occurred. The jury was well aware of the absence of physical evidence linking defendant to the crime. The jury had already heard that Caucasian hairs were found in Chris's hands and that the hairs were never tested because they were lost. Defense counsel was able to argue that, in a hand-to-hand battle, the presence of Caucasian hair indicated a greater likelihood that the assailant was white. Defendant has not demonstrated that the result of trial would have been different had the additional "fibers" been tested and admitted into evidence.

The prosecution did not suppress evidence favorable to defendant and the trial court did not abuse its discretion when it denied defendant's motion for a mistrial. The prosecution was under no obligation to make defendant's case for him and, therefore, was not required to draw defense counsel's attention to evidence already within defense counsel's reach. Although there was no sound trial strategy for failing to pursue testing the fibers, defendant has failed to show that any alleged error was prejudicial.

## VII. SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues that there was insufficient evidence to support his conviction. We disagree.

"This Court reviews de novo defendant's challenge to the sufficiency of the evidence." *People v Meissner*, 294 Mich App 438, 452, 812 NW2d 37 (2011). In reviewing the sufficiency

of the evidence, this Court must view the evidence in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139, 815 NW2d 85 (2012).

On December 9, 2002, Chris left home on foot to take his friend Benny's dogs some venison. Chris was later found dead in a ditch. There were scuff marks, footprints, splattered blood, broken glass and hats found near Chris's body, which indicated evidence of a struggle. Chris had suffered multiple stab wounds and blunt force trauma to the head. There was no DNA evidence or physical evidence directing police officers to the killer, although footwear impressions were taken. A new database allowed for search of similar tread and four of the five casts had similar tread to New Balance 601, 602, and 801, as well as Ascot Z Tech. In a statement to police in 2004, defendant said that he left out the back door of his home through the woods to another home. But then, in another version, defendant said he was curious about who was lying in the ditch, so he went and saw that it was Chris.

The day before the murder, Richard Martinez observed three young people in the street – a black man, a white man, and a white woman. He identified defendant as the black man he saw. The two men appeared to be ready to "square off" and the woman was walking away, apparently wanting nothing to do with it.

The Cousins family, the Green family, and the Barry family all lived on the same street. Chad Cousins (Chad) testified that he thought defendant "fancied" his sister Lisa. He would come over and talk to her and try and "hang out with her." He asked Lisa out on a date a few weeks before the murder. Chad testified that defendant came to the Cousins' home on the day of the murder. Defendant appeared to be nervous and fidgety.

Lisa testified that she met Chris six months prior to his death in the spring of 2002 and considered him one of her best friends. Their romantic relationship sort of "slowly fizzled" once Lisa went back to school in the fall of 2002. Lisa's family lived in a house they rented from the defendant's father. Defendant was friends with her father. She had no relationship with her father, who was abusive to her. Near the time of the murder, Lisa noticed a pair of tennis shoes in the box next to their wood stove. She found it odd that he would burn the shoes, as only wood and paper ever went into the stove. Floyd seemed paranoid when he was burning the shoes.

Two weeks prior to the murder, Chris told Randall Simmons (Randall) that Lisa's father had threatened to kill him if he went back to their house. But Chris also told Randall that Lisa's "boyfriend" threatened to beat him up. Randall thought that maybe Chris was referring to a black man that lived down the street (defendant), an individual whom Chris avoided.

Ashley Cousins (Ashley) saw defendant twice at Claude's apartment on the day of the murder. The first time she saw defendant he was dressed nicely and was wearing clean clothes and shoes. Several hours later Ashley saw defendant a second time. She explained: "He was dressed completely different. He had a different tone to him. He looked like something had upset him and he looked bothered, upset, disgruntled. He was dirty. I remember he was very muddy and very dirty and his shoes were like filthy. He didn't look anything like he had looked earlier that day." Defendant talked quietly with Claude. Ashley "could tell something was wrong. I just didn't know what it was. You could tell something had upset him."

Claude testified that on the day of the murder, defendant came to Claude's apartment and said that someone had been murdered. Claude thought defendant's attitude was "odd." He seemed quiet and nervous. Defendant was not wearing his new shoes. Claude asked if defendant knew anything about the murder, but defendant said no. A few months later, Claude told defendant that the police "was kicking in my doors looking for me." That was when defendant told Claude "what happened" and how "he had got into it with" Chris. Claude testified: "I guess Christopher was looking through the window or something, I don't know, and then they got into it and that he had killed him." Claude told police about this conversation in 2003 and, in exchange, prosecutors did not pursue breaking and entering charges against him. He still went to prison for over a year for a probation violation.

Claude got out of prison only to get into trouble once again. He realized that the police had re-opened the investigation and Claude agreed to make contact with defendant and wore a wire when talking to defendant.

Jeanine testified that on the day of the murder, defendant came to the apartment she shared with Claude and "he just wasn't his self." He was pacing and it appeared that something was bothering him. Defendant was not wearing the new shoes Jeanine had bought for him – New Balance brand. Approximately a month after the murder, defendant told Jeanine that he had burned the shoes in a barrel behind the house because they had blood on them. Defendant said that somebody he did not know had been looking through the window and he grabbed a knife and went outside to "scare him off." Defendant admitted to stabbing the individual.

Antonio testified that defendant called him and said "'Do you want to know something?'" and proceeded to tell Antonio that he beat up Chris, and got blood on his shoes.

John Reed (John) testified that in 2012, defendant "come out to the house and he was looking for Boddy and he said, well, do you know where the nigger lives, and I said, yeah. He said, well, will you take me up there so I can kill the nigger because he said – he's been going around town saying that I raped Green and killed him – raped him before I killed him." Defendant told John that he did some "bad stuff" while John was in prison. Defendant told John that both he and Chris were dating Lisa. Defendant said that he and Boddy waited until Chris came near the trailer and then defendant "he beat him up."

Defendant attempted to explain his damning statements by implying that he was not only of low intellect, but suffered notions of grandeur. Licensed psychologist William Brooks testified that defendant had borderline intellectual functioning and "psychotic disorder not otherwise specified." Someone with the disorder would demonstrate thought disorder and delusional thinking. There may be severe and significant mood instability. Grandiosity, i.e., the need to be the center of attention is also a feature. An individual with delusions of grandeur wants to be "a part of the action, be a part of the center of the focus, be somebody important to the person that you want to impress." Someone with a low IQ might be gullible or easily manipulated.

"The elements of premeditated murder are (1) an intentional killing of a human being (2) with premeditation and deliberation." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). Defendant argues that there was insufficient evidence that he was the killer. As the

prosecutor points out, however, defendant really takes issue with the jury's credibility determinations. Defense counsel fully explored each witness's potential motivation for lying, yet the jury found defendant guilty anyway. An appellate court "will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Eisen*, 296 Mich App 326, 331, 820 NW2d 229 (2012) (internal quotation marks omitted); see also *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748, amended 441 Mich 1201 (1992). And while there was little physical evidence on the scene to help the police officers, foot impressions were taken. There was evidence that defendant wore a pair of tennis shoes near the time of the murder that matched the tread of those found at the scene. There was also evidence that defendant told a witness that he burned the shoes because they had blood on them. Lisa testified that she saw her father burn tennis shoes in their wood stove. He and defendant were friends. Taking the evidence in a light most favorable to the prosecution, there was sufficient evidence for a jury to conclude that Chris was murdered and defendant was the culprit.

Affirmed.

/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto