# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAVID EUGENE HURSLEY,

Defendant-Appellant.

UNPUBLISHED
March 6, 2018

No. 335638
Calhoun Circuit Court
LC No. 2016-001041-FH

Before: MARKEY, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Defendant, David Eugene Hursley, was found guilty following a jury trial of killing or torturing an animal, MCL 750.50b(2)(a); and animal cruelty, MCL 750.50(2). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 46 months to 15 years' imprisonment for the felony conviction of killing or torturing an animal and to 45 days in county jail for the misdemeanor conviction of animal cruelty, with the sentences to run concurrently and credit for 45 days served. Defendant now appeals by right. We affirm defendant's convictions and sentence but remand for the limited purpose of striking certain letters from defendant's presentence investigation report (PSIR) packet.

This case arises out of the beating and death of a dog on February 9, 2016. The dog's owner, Efren Salinas, got the dog as a puppy and had him for about five years. Efren's mother, Maria Reyes, owned a house on Bennett Street in Battle Creek, but when she moved to Ohio in January 2014, she left Efren in charge of the Bennett Street house. Multiple people lived in the house at various times, including defendant, who lived there for 17 months before the incident happened. For about 10 months in late 2014 and early 2015, Efren and the dog lived at the house with defendant before Efren and the dog moved to another property that Efren owned. Efren's family, including Efren's sister, Osmara Salinas, knew the dog well. They never had a problem with the dog and were not aware of anyone ever having a problem with the dog.

After Efren was arrested in January 2016, the dog lived with Efren's family in Ohio, but the dog accompanied the family to Michigan every time they went to visit Efren. Reyes testified that on February 6, 2016, she went to the Bennett Street house because the tenants were behind on paying utility bills. She had the dog in the car with her, intending to head back to Ohio, but defendant offered to take care of the dog while the family was dealing with Efren's case. Defendant told Reyes that he would be happy to keep the dog because defendant loved the dog,

-1-

and the dog was gentle and friendly. Efren's family planned to retrieve the dog in about a week, but February 6 was the last time they saw it.

On February 9, 2016, there were five people living at the Bennett Street house—defendant, David Hill, Christopher Mazur, Max Foster, and a woman named Crystal.[1] Mazur had lived at the house previously in October and November 2015 before he was arrested for a parole violation, but he had just moved back to the house that same day. Mazur testified that he met the dog when he got to the house, and the dog was very friendly.

Mazur described the events of the night of February 9, 2016. He saw defendant and Hill consume about a pint of whiskey in approximately 45 minutes, after which defendant and Hill were "pretty inebriated." Mazur and Hill went into the kitchen to make something for defendant to eat to help with his intoxication. The dog followed them into the kitchen and started begging for food. Defendant tried to call the dog back to the living room so he would stop begging. Mazur then heard a commotion in the living room, turned toward it and saw defendant punch the dog. Mazur tried to convince defendant to just take the dog out back, but defendant and Hill just began "pummeling the dog." Defendant said repeatedly that the dog was driving him nuts with the begging and that the dog needed to learn his manners. Both defendant and Hill said that they were sick of the dog. Defendant ran to his room saying that he was going to kill the dog. Hill was still hitting the dog. When Hill grabbed the dog by his hind legs, the dog bit Hill's hand. Defendant came back to the living room with a pellet gun and shot the dog. The dog flopped around on the living room floor in pain. Mazur said that he panicked, and when he turned away to call for help, he could not get his phone to work. Mazur saw Foster come downstairs, and Foster asked what was happening. Defendant replied, "This dog is going crazy." Mazur testified that he went back to the living room, but defendant pointed his gun at Mazur, telling him not to get involved. Mazur backed away to the kitchen and then heard another shot. The dog was crying, and blood was going everywhere as he flopped around, but he was not dead. Mazur testified that defendant then grabbed a baseball bat and began beating the dog with the bat. As defendant and Hill were dragging the dog in a blanket to the back porch, Mazur heard a knock at the door and opened the door for the police.

Foster's account of that night largely matched Mazur's testimony. Foster had moved into the house only about a week before the incident. He testified that the dog was very friendly and he loved the dog. Foster testified that on that night, Mazur was in the kitchen cooking. Foster was upstairs, but when he heard a popping sound, he went downstairs to see what happened. He saw the dog running around in a pool of blood, and he described Mazur as having "the shakes." When Foster asked what happened, defendant told Foster to go back upstairs and not get involved. Defendant also said that the dog had bitten him. When Foster saw the gun, which at first he thought was real, he headed upstairs and called 911. Foster heard another popping sound while he was waiting for the police to arrive. When he saw the police arrive through the window, he headed back downstairs and saw Hill cleaning up a pool of blood in the living room.

---

[1] Crystal was never identified by last name; she was not present for the incident, and she did not testify at defendant's trial.

Foster talked to Mazur and found that Mazur was really shaken up because defendant had pointed the gun at his face.

Defendant's and Hill's testimonies regarding the events of that night varied greatly from the accounts given by Mazur and Foster. According to defendant, Hill and defendant were sitting in the living room watching TV. Hill was sitting on the couch, and defendant was sitting on the loveseat. Defendant did not know what set the dog off, but the dog started barking and bit Hill's hand. Defendant could see blood on Hill's hand, and then the dog turned on defendant. Defendant was able to get away without getting bit, but the dog started attacking Hill again, so defendant grabbed the baseball bat and hit the dog three times. The dog stopped attacking Hill and went down. Defendant could tell that he hurt the dog badly in protecting Hill, so defendant got a pellet gun to put the dog down. He shot the dog once in the head, reloaded, and shot the dog again. Because he was still unable to put the dog down, defendant wrapped the dog in a blanket to take him to the back. Immediately after he dragged the dog to the back porch, the police arrived, and defendant opened the door for them.

Defendant testified that Mazur was not there during the incident at all and only showed up after it happened. He also claimed that he had never pointed the gun at either Mazur or Foster and that he never hit the dog with his fists. Although defendant admitted that he was drinking beer and liquor that night, he said he "wasn't sloppy drunk." Defendant described the dog as vicious and said that he "never bonded with" the dog. Defendant said that even though the dog was never vicious toward anyone at the house, the dog would bare his teeth and bark at strangers walking by, and the dog particularly disliked black people. Contrary to Osmara's and Reyes's testimonies, defendant maintained that the dog lived with him all of January and February for a total of about six weeks. Defendant claimed that on two separate occasions in January 2016, the dog bit defendant and Hill, but he never told anyone that the dog was aggressive because he did not "need to make waves with [his] landlords."

Hill's testimony was fairly consistent with defendant's testimony. Hill testified that he did not think that Mazur was at the house on the night of the incident. According to Hill, defendant and he were sitting on the couch watching TV when suddenly the dog bit his hand. The dog continued to attack Hill, and when defendant tried to push the dog away, the dog bit defendant also. When the dog kept attacking, defendant punched the dog a couple of times, but when the dog was still aggressive, defendant got a baseball bat and hit the dog with the bat. Then, defendant got a pellet gun and shot the dog to put the dog out of his misery. Hill testified that the blood on the dog was from the hits with the baseball bat and that defendant only shot the dog once. Hill said that the only blood on the floor from the dog was on the porch and that was where he tried to clean the blood up. Hill did not ever see Foster during the incident. Hill stated that he had a fairly decent recollection of that night because defendant and he had only consumed a few beers but that his memory was not very good because he suffered a bad head injury about seven years before the incident.

Hill said that the dog had bitten him on the arm about three to four months before the incident and that Hill had seen the dog bite defendant as well. Hill also testified that the dog had tried to attack people when Hill had taken the dog for walks and that the dog disliked black people. Although both defendant and Hill claimed that the dog disliked black people, Foster testified that he and the dog were very close and that he is a black man. Foster further testified

that he took the dog with him to visit people at a shelter, and he never saw the dog be aggressive towards anyone of any race.

Four officers arrived at the house at approximately 8:30 p.m. Officer Craig Kidney was the first to arrive. Because the dispatch call had mentioned shots fired, he did not approach the house without the other officers. He stood to the side of the house and looked through the big picture window. He saw somebody dragging something from the front part of the house toward the back part of the house. He also saw another person, whom he later identified as Hill, cleaning something off the living room floor that appeared to be quite a bit of blood. Sergeant Todd Elliott was the next to arrive. After he spoke to Officer Kidney, he approached the house and could see through the front window that someone was on hands and knees cleaning up a pool of blood in the living room. He described the view as looking "like what would have been a gruesome homicide scene." He wanted to secure the house because of the report of shots fired, so he and Officer Kidney knocked on the front door, and two other officers went to the back door to make sure no one escaped.

Sergeant Elliott recalled smelling "intoxicants coming from [defendant's] breath" when he spoke with defendant briefly at the house. Officer Kidney believed that Hill was also intoxicated because Officer Kidney had dealt with Hill before on multiple occasions when Hill required medical treatment for intoxication. On the night of the incident Officer Kidney could smell intoxicants on Hill; he noticed Hill slurring his words, and Hill was acting intoxicated.

When the officers had finished securing the house and saw the dog, the dog was in the enclosed back porch of the house and appeared to be in severe pain. Sergeant Elliott determined, and Officer Kidney agreed, that the officers should put the dog down because the dog seemed to be suffering. He helped Officer Kidney move the dog to the backyard, and then Officer Kidney shot the dog once in the head.

Defendant first argues on appeal that the evidence presented at trial was insufficient to convict him of killing or torturing an animal. "This Court reviews de novo challenges to the sufficiency of the evidence." *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). "Taking the evidence in the light most favorable to the prosecution, the question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). "In determining whether sufficient evidence was presented to support a conviction, the reviewing court will not interfere with the fact-finder's role of deciding the credibility of the witnesses." *Solloway*, 316 Mich App at 180.

Defendant was convicted of killing or torturing an animal under MCL 750.50b(2)(a), which provides in pertinent part that "a person shall not . . . without just cause . . . [k]nowingly kill, torture, mutilate, maim, or disfigure an animal." The trial court instructed the jury that "torture" was the infliction of "severe physical or mental pain and agony or anguish." The elements of a crime may be proved with circumstantial evidence and reasonable inferences arising from that evidence. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999).

Animal torture is a general intent crime. *People v Fennell*, 260 Mich App 261, 269; 677 NW2d 66 (2004). Consequently, the prosecution is not required to show that defendant intended

to harm the dog. *People v Henderson*, 282 Mich App 307, 316; 765 NW2d 619 (2009). Rather, the prosecution is required to show "that defendant 1) committed the act, 2) while knowing it to be wrong, 3) without just cause or excuse, and 4) did it intentionally or 5) with a conscious disregard of known risks to the property of another." *Id*. at 270 (quotation marks and citation omitted).

The prosecution presented evidence that defendant tortured the dog. Mazur testified that the dog appeared to be knocked unconscious, "like in a semi-state," after defendant first punched the dog. He also testified that the dog was never able to get up after the first punch, that blood was spraying from the dog's neck, and that the dog appeared to be having seizures. Foster testified that when he came downstairs after the first shot, the dog was covered in so much blood that he did not recognize the dog because the dog's fur was a different color. He also described the dog as lying on the ground, spinning around on his side, and howling. Furthermore, the officers who responded to the scene described the condition of the dog: they testified that the dog appeared to be in severe pain, had much blood on his head and neck area, had difficulty breathing, and had eyes "twitching every which way." Given the extensive testimony that the dog was suffering, a rational juror could find the element of torture beyond a reasonable doubt. *Hardiman*, 466 Mich at 421.

The prosecution also presented evidence that defendant acted intentionally and without just cause. Mazur testified that defendant beat the dog because the dog was begging for food, and defendant wanted to teach the dog manners. Defendant, on the other hand, argues that his actions were justified because he was beating the dog to stop it from attacking Hill, not because the dog was begging for food. While it is true that both defendant and Hill testified that the dog bit Hill's hand before the attack began, their testimonies often conflicted with other evidence presented. Both men testified that Mazur was not at the house during the incident, but Foster recalls seeing Mazur when he came downstairs after hearing the first shot, and the officers found Mazur at the house when they arrived. Defendant testified that the dog had attacked both defendant and Hill before the incident in January 2016, but Osmara and Reyes testified that they did not leave the dog with defendant until early February 2016 and remembered the date well because it was at the same time that Efren was deported. And although Hill had a wound and blood on his hand, Officer Kidney examined Hill's hand on the night of the incident and could not be sure whether the blood was Hill's own blood or blood from the dog that he was cleaning up. Foster also testified that the wound on Hill's hand was an old injury and was not bleeding.

"All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Also, this Court "will not interfere with the fact-finder's role of deciding the credibility of the witnesses." *Solloway*, 316 Mich App at 180. Therefore, because the prosecution presented Mazur's testimony from which the jury could infer that defendant acted intentionally and without just cause, a rational juror could have found those elements proven beyond a reasonable doubt. See *Hardiman*, 466 Mich at 421

Defendant also argues that he was entitled to kill the dog because MCL 750.50b does not prohibit the lawful killing of an animal pursuant to MCL 287.279. See MCL 750.50b(9)(e). MCL 287.279 provides: "Any person . . . may kill any dog which he sees in the act of . . . attacking persons, and there shall be no liability on such person in damages or otherwise, for such killing." Mazur's testimony, however, showed that the dog only bit Hill after defendant

and Hill first attacked the dog. We cannot conclude that defendant was entitled to kill a dog that bit a person only after it was attacked because that would subvert the purpose of the animal cruelty statutes, which is to ensure that animals are treated humanely. See MCL 750.49 *et seq*. We conclude that because a rational juror could find all the elements of the crime proven beyond a reasonable doubt and because MCL 287.279 does not protect a defendant who has provoked a dog by torturing it before it attacked a person, defendant's conviction for killing or torturing an animal is supported by legally sufficient evidence.

Defendant next argues he was improperly sentenced as a habitual offender because the prosecution cannot show that defendant was served with the habitual offender notice because no proof of service was filed with the trial court as required by MCL 769.13(2). To enhance a sentence because the offender has prior convictions, the prosecuting attorney must file "a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense." MCL 769.13(1). Similarly, MCR 6.112(F) provides "[t]he notice must be filed within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived . . . within 21 days after the filing of the information charging the underlying offense."

Whether defendant was subject to enhancement under MCL 769.12 as a fourth-offense habitual offender, presents an issue of statutory interpretation reviewed de novo. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Also, whether the prosecutor complied with the applicable court rule is reviewed de novo. *Hinkle v Wayne Co Clerk*, 467 Mich 337, 340; 654 NW2d 315 (2002). Unpreserved trial errors are reviewed for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763.

Defendant's argument lacks merit; at worst, the record shows harmless error for the prosecution's failing to file a proof of service according to MCL 769.13(2). The error was harmless because the prosecutor included the habitual offender notice with the information, so it was timely filed in accordance with MCL 769.13(1) and MCR 6.112(F). The trial court record reflects that the information and habitual notice were filed in the circuit court on April 18, 2017. Defendant appeared in circuit court on May 8, 2017, and the trial court arraigned defendant on both the underlying charges in the information and also the attached notice of the habitual offender enhancement. In sum, the habitual offender notice was timely filed, and defendant had actual notice of it. Regardless of whether the prosecutor failed to file a proof of service, no error warranting reversal occurred. MCR 6.112(G); *Carines*, 460 Mich at 763.

Lastly, defendant argues that the trial court should not have included letters from community members in defendant's PSIR. Generally, "[f]or an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Defendant asserts that all letters from community members should be stricken from the PSIR, but defendant only objected to "some of the attached letters" at sentencing and for one of those letters, he only objected because the author's identity was unknown. Thus, the issues with the letters that were raised at sentencing are preserved, but other issues that were not raised are unpreserved. *Id*.

If the issues are preserved, "[t]he trial court's response to a claim of inaccuracies in the presentence investigation report is reviewed for an abuse of discretion." *People v Waclawski*, 286 Mich App 634, 689; 780 NW2d 321 (2009). "A court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes." *Id*. Unpreserved issues, on the other hand, are reviewed for plain error affecting substantial rights. *People v Cain*, 498 Mich 108, 114-116; 869 NW2d 829 (2015). Defendant must satisfy the four-part test articulated in *Carines*, 460 Mich at 763, to prevail under this standard. Defendant must show "that (1) an error occurred, (2) the error was 'plain'—i.e., clear or obvious, and (3) the error affected substantial rights—i.e., the outcome of the lower court proceedings was affected." *Cain*, 498 Mich at 116. Furthermore, even if the first three prongs are satisfied, an appellate court should "exercise its discretion in deciding whether to reverse" and "relief is warranted only when the court determines that the plain, forfeited error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Id*., citing *Carines*, 460 Mich at 763 (quotation marks omitted).

Under MCR 6.425(E)(2), a defendant may challenge any information in the presentence report, and the trial court must "make a finding with respect to the challenge or determine that a finding is unnecessary because it will not take the challenged information into account at sentencing." "If the court finds that challenged information is inaccurate or irrelevant, that finding must be made part of the record and the information must be corrected or stricken from the report." *Waclawski*, 286 Mich App at 690, citing MCL 771.14(6) and MCR 6.425(E)(2). But "[t]he failure to strike disregarded information can be harmless error." *Id*.

"[W]hen the alleged inaccuracies would have no determinative effect on the sentence, the court's failure to respond may be considered harmless error." *People v McAllister*, 241 Mich App 466, 473; 616 NW2d 203 (2000). But "[b]ecause the Department of Corrections makes critical decisions concerning a defendant's status on the basis of information contained in the PSIR, the PSIR should accurately reflect any determination the sentencing judge has made regarding the accuracy or relevance of its information." *Waclawski*, 286 Mich App at 689.

As an initial matter, defendant unpersuasively argues that the trial court lacked statutory authority to include letters from people who are not direct victims and that this Court should generally strike all letters from members of the community. "MCL 780.764 and 780.765 grant individuals who suffer direct or threatened harm as a result of a convicted individual's crime the right to submit an impact statement both at the sentencing hearing and for inclusion in the PSIR; however, the right is not limited exclusively to the defendant's direct victims." *Id*. at 691. Sentencing courts are afforded discretion in the sources and types of information they may consider when imposing a sentence. *Id*. Thus, "the law does not limit victim's impact statements to direct victims." *Id*. at 692. Consequently, the trial court did not abuse its discretion in including non-victim letters in the PSIR. Nevertheless, the trial court should have stricken most of the letters based on defendant's objections and the trial court's response.

At sentencing, defendant first objected to a letter that "appear[ed] to be an unsigned, undated and unnamed letter," so defendant's only complaint was the lack of identification. The

trial court had a separate version of the letter that was properly signed by JR.[2] The trial court offered to replace the unidentified copy of the letter with the signed copy if "that would take care of [defendant's] concern," and defense counsel accepted that response. The trial court did not abuse its discretion in its response to defendant's objection to the JR letter. To the extent that defendant argues that the trial court should have stricken the JR letter in its entirety, we review for plain error. We find that the trial court did not plainly err in including the letter because it did not change the outcome of the proceeding. See *Cain*, 498 Mich at 116.

The defendant next objected to three letters written by CS, LP, and NM on the basis that the letters contained information, opinions, and probabilities that were "inappropriate for the court to consider." In response to each of defendant's objections, the trial court assured defendant that it would only be taking into consideration factors specific to the offense and would not consider information provided by members of the community. Because the trial court was not taking information from the CS, LP, and NM letters into consideration, defendant was entitled to have the information stricken from the PSIR. See MCL 771.14(6); MCR 6.425(E)(2). And because the Department of Corrections uses information from the PSIR in determining defendant's status, if the trial court determined that opinions and hypotheses about defendant's potential for violence contained in the letters from community members were irrelevant, the PSIR should reflect that determination. See *Waclawski*, 286 Mich App at 689.

There is one final letter from community member CW included in the PSIR packet. At sentencing, the trial court mentioned the CW letter and stated that it would be "in the court file on the non-public side," but the letter was "not going with the PSI packet." Despite the trial court's decision not to include the CW letter in the PSIR packet, the letter was still included. The PSIR should reflect the trial court's decision not to include that letter. *Id*.

While the trial court did not err in including non-direct victim letters in the PSIR packet generally, it should have stricken the letters that it determined contained irrelevant information and that it ruled should not be included with the PSIR. See *id*. Therefore, with the exception of the JR letter, we conclude that the trial court should have stricken the remaining letters from community members. See *id*.

In conclusion, we affirm defendant's convictions and sentence, but we remand for the limited purpose of striking and removing certain letters from the PSIR packet, including the CW letter, consistent with this opinion. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola

---

[2] The letters in this opinion will be identified by the initials of their authors.